**TENNESSEE DEPARTMENT OF HUMAN SERVICES,
Plaintiff-Appellee,**

v.

**Tommy Lee RILEY and Peggy Sue Riley, Defendants-Appellants.**

Court of Appeals of Tennessee, Western Section at Jackson.

Dec. 5, 1984.

Application for Permission to Appeal Denied March 4, 1985.

Leland Dale Wilson, Dyersburg, for defendants-appellants.

Dianne Stamey, Asst. Atty. Gen., Nashville, for plaintiff-appellee.

CRAWFORD, Judge.

Tommy Lee and Peggy Sue Riley (hereinafter the Rileys) appeal from the judgment of the Circuit Court of Obion County which terminated their parental rights to their two minor children Peggy Lee, born April 26, 1974 and Charles, born January 1, 1977. The Tennessee Department of Human Services (hereinafter TDHS) initiated this action by a petition filed in the Juvenile Court of Obion County which entered an order terminating the Rileys' parental rights. On appeal to the Circuit Court the case was heard *de novo*, resulting in a judgment terminating the parental rights of the Rileys.

The court terminated the Riley's parental rights pursuant to Tenn.Code Ann. § 37–246(d)(1) (1977), the applicable statute of termination[1], which provided in pertinent part:

\* \* \* \* \* \*

(d) After hearing evidence on a termination petition, the court may terminate parental rights if it finds on the basis of clear and convincing evidence that termination is in the child's best interest and that ... the following conditions exist:

(1) The child has been removed from the custody of the parent by the court for at least one (1) year and the court finds that:

(A) The conditions which led to the removal still persist:

(B) There is little likelihood that these conditions will be remedied at any early date so that the child can be returned to the parent in the near future; and

(C) The continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

\* \* \* \* \* \*

■ Thus, in order to terminate parental rights under subparagraph (1) of Section 37–246(d), the court must find five elements: (1) The termination must be in the best interest of the children. § 37–246(d); (2) The children must have been removed from the custody of the parent by the court for at least one year. § 37–246(d)(1); (3) The conditions which led to the removal must still exist. § 37–246(d)(1)(A); (4) There must be little chance that these conditions will be remedied so that the children can be returned to the parent at an early date. § 37–246(d)(1)(B); and (5) The continuation of the parent-child relationship must greatly diminish the children's opportunities for early integration into a stable and permanent home. § 37–246(d)(1)(C). Each requirement necessary for a termination under this subparagraph must be found by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The judgment of the trial court recited that the findings of that court were based on clear and convincing evidence and specifically found the existence of the five elements set out above.

The Rileys present the following issues for review:

1. Whether TDHS followed the foster care review procedures?

2. Whether the visitation arrangements were conducive to achieving the goal of reuniting the family?

3. Whether TDHS provided rehabilitative services to help the Rileys after the removal of their children.

Prior to addressing these specific issues, we turn to an examination of the record. We shall outline the judicial and adminis-

1. This statute has been amended in several re- spects and is now T.C.A. 37–1–147(d) (1984).

trative procedures followed and summarize each witness' testimony since this evidence provides a background for understanding our disposition of this case.

The record indicates that the Rileys' two minor children, then ages 5 and 2, were removed from their natural parents in June, 1979. On July 27, 1979, the Obion County Juvenile Court found the children "dependent and neglected." Pursuant to statute, TDHS filed a Foster Care Plan with the court on August 28, 1979, and that report was approved by the court on March 6, 1980. Subsequent TDHS reports were timely filed and approved and a guardian ad litem was appointed for the children in September, 1981. These actions occurred before an order to permanently terminate the Rileys' rights was filed on December 8, 1982.

The children were placed with seven different foster families before they went to live in Blakeman's home in August, 1982. That home has been approved for adoption should the Riley children, who have continued to live with the Blakemans, be available.

At the Circuit Court trial, the first witness was Ruth Carlisle who, as a TDHS caseworker, had worked with the Rileys since 1977. She was the TDHS representative when it initiated these proceedings in June, 1979.

Mrs. Carlisle testified to the living conditions in which the Rileys lived at the time the children were removed. She described the house as being built from junkyard parts and sparsely furnished. She testified that it was littered with dirty clothes and bed linens, filth and waste food, and dirty pots and pans. The only running water in the house was cold water available at the kitchen sink.

Later, Mrs. Carlisle described the home in which Mr. and Mrs. Riley currently live. It is a more substantially built four rooms, although it has cracks large enough to enable one to see through to the outside. There is still no running water. Mrs. Carlisle testified that on one trip the only food she saw in the house was a bag of potatoes and a half a bottle of Coke. Significantly, as to whether conditions had improved, the record reflects the following question to and response of Mrs. Carlisle:

Q. Have you noticed any improvements in the living conditions enough that the children could be returned ...?

A. No sir.

During Mrs. Carlisle's testimony, she outlined programs the TDHS had provided the Rileys from 1977 until the children's removal in 1979. She noted that a state employed housekeeper had made weekly visits to the Rileys' home for counseling, that the children had been placed in day care, and that the department had worked to provide the family with all available government subsidies.

Contrasted with the above programs provided the Rileys prior to their children's removal, Mrs. Carlisle reported that since the children had become wards of the state, TDHS had continued to provide counseling; however, she admitted on cross examination that this service was limited to the times she could catch the Rileys at home. In addition, she reported that TDHS had arranged visits and provided transportation in order for the Rileys to see their children. On cross-examination, Mrs. Carlisle conceded that Mrs. Riley had made numerous phone calls inquiring about her children and requesting visits. The caseworker testified that visits were arranged whenever possible.

The second witness, a psychologist, testified that he had tested Mr. Riley and found his IQ to be 72 on an individually administered test. According to the psychologist's further testimony, Mr. Riley's IQ range enabled him to do unskilled work and possibly, with training, to perform lower level skilled tasks.

The next witness, another psychologist, testified that she had given Mrs. Riley IQ tests. These tests had determined that Mrs. Riley's IQ was 46, which in the psychologist's opinion was the equivelent age of a 7 year old. The testimony continued:

Q. Can you identify some of the capabilities a person with this age would have?

A. Well, they would be able to dress themselves, feed themselves, do simple household chores. A seven year old, you know, might be able to cook some simple foods, but probably couldn't read a recipe to follow it, you know, to the "t". They could do the basic self-help skills.

Q. What about limitations; are there certain limitations attributable to moderate mental retardation?

A. Usually, well, not usually, but nearly all the time, these people function on a very concrete level. They are able to deal with concrete things such as I said simple chores, but when it comes to making judgments such as legal, moral, and those kinds of things, they would not be able to think abstractly enough to do these sorts of things. They would really need supervision in caring for themselves.

Q. Even in the daily running of a household?

A. I would not want to leave a seven year old child in a household by themselves. Basically, that's what you can sort of relate it to.

Q. I guess the answer of this question is obvious from what you just stated, but would she be able to perform the duties of parenting and supervision and the general care of children?

A. Well, my test didn't really test that, but I would say that a person that is functioning at this level, as I said, would need supervision themselves in taking care of their daily lives, and I would, therefore, think that it would be extremely difficult for them to care for children and care for them adequately.

Q. Would her judgment be the same as that of a seven year old, or does your test measure that?

A. Well, one of the subtests is called verbal comprehension, and it measures social judgment and logical reasoning, and she scored in the moderate range on that subtest. So, I would say that her logical reasoning and judgment would be impaired, also.

The fourth trial witness, a cook for the day care center the Riley children attended before they were taken from the Rileys' home, stated that the children were "poorly dressed" and not clean. Following that testimony, Peggy Lee's day care teacher testified that Peggy Lee "... was unkept. She was not clean."

The TDHS homemaker, Mrs. Spurgeon, in her testimony recounted her contacts with the Rileys. When asked what she had hoped to accomplish on her weekly visits to the Riley home from 1977 until 1979, she stated that she wanted to help Mrs. Riley learn homemaking skills, to take the children for appointments, and to be a family friend. She stated: "[t]he children were very outgoing, smiling, happy, but they were dirty. Food was not—There was bologna, soup and things of that nature. No really well prepared meals were given to them. The dirt was really the worst ... [The house] was not fit for humans to live in." Mrs. Spurgeon stated further that all of her efforts to help Mrs. Riley were in vain because she had difficulty remembering what she had learned on the previous visit. Mrs. Spurgeon testified as to the following specific instances: she had seen Charles playing in chicken manure; she had observed Mr. Riley's mother, who lived adjacent to her son and his family, drunk and in a rage one morning; she had been told by Mrs. Riley that Mr. Riley had on one occasion set their bed on fire, that he had used a portion of their food stamp money to buy beer, and finally that her husband's brother had forced her to have sex with him and had sexually molested Peggy Lee.

On cross examination, Mrs. Spurgeon noted that she quit working for TDHS approximately six months prior to her posi-

tion being cut from the state budget and that there was no replacement for her during this six month period. She stated that she believed that Mrs. Riley loved her children although Mrs. Spurgeon had, on one occasion, observed bruises on Peggy Lee's body that were the result of Mrs. Riley having whipped her.

Following the homemaker's testimony, the proposed adoptive mother, Mrs. Blakeman, testified. Mrs. Blakeman stated that she and her husband have been married 13 years, that they have no natural children, and that they have been approved for adoption. She further testified that since the children arrived in their home in August, 1982, she and her husband had received no financial compensation, but had provided for the children from her salary as an inventory clerk at a local retail store and her husband's farm profits. When asked about her intentions with regard to the children, she replied that she loved the children and wished to adopt them. Her husband, Mr. Blakeman, later substantiated this testimony.

Following the Blakeman's testimony, the Riley children's teacher testified that Charles had made "significant progress— ... two years worth" during the last year and that "Peggy [had] started being more outgoing and opening up and doing better at school, also." The teacher also pointed out that Charles, as a special education student, and Peggy Lee, as a hyperactive child, needed individualized assistance and a highly structured environment.

The next witness, Hazel Watt, the Carroll County TDHS worker, reported having worked with the Riley children since 1980. When asked whether their current home would be suitable for adoption, she replied that it was one of the best, was stable, and that the children seemed to have adjusted well while there. She stated that she felt it would be in the children's best interest to be adopted.

To the TDHS proof outlined above, the Rileys offered the following witnesses: First, Mr. Riley was called to testify. He stated that he worked at various farming jobs most of which were seasonal, and the majority of which were unsupervised. With regard to his present house, he stated that the roof does not leak, that the house is heated adequately by a wood-burning stove, and that the house is wired for electricity. He stated that his wife cooks lunch and dinner for him daily. He added that they have to bring water from his mother-in-law's home which is approximately 100 yards away, but that he has water-line connections available. When questioned about his efforts to find improved housing, he stated that TDHS had done nothing to help him with his problem. With regard to his visitations with the children, Mr. Riley stated that he had had difficulty arranging for transportation and a suitable time to see his children. In addition, he testified that he had received no counseling and no help from TDHS since his children had been removed. He testified that he and his wife currently receive no foodstamps and no social security payments to supplement his $60 per week salary. He admitted having made no monetary contributions to his children's support since they had been removed from his home. He does not use alcohol, and he loves his children and wants them back.

The defense's second witness was Mrs. Riley. She testified that she had not seen her children in a long time, but admitted having seen Mrs. Carlisle and the children's guardian ad litem recently. She said that she loves her children and "[is] trying real hard to get them back," and promised to do better if the children were returned to her care.

With regard to her homemaking skills, Mrs. Riley stated that she could and does cook and clean on a regular basis and that she babysits with her brother's children frequently during the day. She testified that their present house has neither an outdoor bathroom nor an outhouse, but said "we go to the junkyard." On cross-examination Mrs. Riley responded that she did not know the date of her birth and that she could not tell which letter came after "N" or "W" in the alphabet.

James Beasley, Mrs. Riley's brother, was the third defense witness called. He supported Mrs. Riley's statement that she had kept his three children from 5:30 a.m. until 3:30 p.m. every day for one year and that she did that job well. He stated further that Mr. Riley had made home improvements on the current house in which the Rileys live. On cross examination, he admitted that his sister had some "mental problems."

In addition to the testimony summarized above, the record also includes two reports prepared by the Riley children's guardian ad litem Mr. Bruce Moss. Mr. Moss' first report was prepared subsequent to his February 8, 1982 visit to the Riley home. At the time he evaluated the house with its "gaping cracks," "numerous broken windows" and general filth to be "most definitely not suited for or conducive to the proper rearing of anyone, much less, minor children." He went further and noted that the neighborhood was cluttered with abandoned vehicles and garbage. Both parents, whom he described as being "unkept and in need of cleansing," suffered from mental infirmities which were not likely to worsen or to improve. Finally, he concluded that he saw no way that the Rileys could ever care for their children. He, therefore, recommended that the children's best interest be served by terminating the Riley's parental rights.

Mr. Moss' second report included a finding that, while the Rileys had moved since his last visit, their house was "of very similar conditions." Dirt, clutter and flies were observed throughout the house and metal, glass and other discarded objects were in the yard. The only food in the kitchen had been a sack of potatoes. There was no running water. Moss observed that during this visit Mrs. Riley could not remember the simplest bit of information— she did not remember him or his visit 18 months earlier.

The guardian ad litem also visited in the home of the proposed adoptive parents and found it favorable in every way. In addition, the children, when questioned, indicated that they wished to stay with the Blakemans. Mr. Moss' report concludes with the observation "that the conditions which lead [sic] to removal over three years ago still persists and there seems little likelihood that it will be remedied in the near future." His report cites specifically the dangerous physical conditions, the parents' limited mental abilities, and the parents' lack of efforts to remedy the problem areas as the bases for his conclusion.

■ Although the Rileys have presented three issues for review we must keep in mind that all issues in a case of this type are premised on the foundation issue of "what is in the best interest of the child." With this observation we turn to an examination of the issues the Rileys raise through their counsel. For simplicity, we consider issues one and three together:

Whether TDHS provided the rehabilitative services to help the Rileys after their children were removed and whether TDHS followed the proper foster care plan review procedures.

Tenn.Code Ann. § 37–246[2] provided guidance for the court in ruling whether termination is in the best interests of children and whether there is a chance for an early remedy to the conditions that led to foster care:

(e) In determining whether there is likelihood that the child can be returned to the parent in the near future and whether termination of parental rights is in the best interests of the child, the court shall consider, but is not limited to, the following:

(1) Whether the parent has made such an adjustment of circumstances, conduct or conditions as to make it in the child's best interests to return home in the foreseeable future;

(2) Whether the parent has failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting

2. This section is now 37–1–147(e) (1984).

adjustment does not reasonably appear possible;

(3) Whether there is brutality, abuse or neglect toward other children in the family;

(4) Whether there is such use of alcohol or controlled substances as may render the parent consistently unable to care for the child;

(5) Whether the parent has paid a reasonable portion of substitute physical care and maintenance when financially able to do so;

(6) Whether the parent has maintained regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent.

■ The major thrust of the Riley's argument is that the failure of TDHS to comply with the requirements governing foster care set out in Tenn.Code Ann. § 37-1502, 1503 and 1505[3] should prevent the court's finding that TDHS made reasonable efforts to rehabilitate the family unit. The weakness in Riley's argument is two-fold. First, as to the actual foster care plans required by the statute there is neither allegation nor proof that these plans were not executed. The Rileys do contend that the plans were not timely prepared. We note that the original plan was prepared within thirty days after the court found the children dependent and neglected and was ratified within thirty days thereafter. While the progress reports were not within the letter of the law requiring that they be made every six months for the first year, the first report was filed within four months of the court's approval of the plan and the second report some seven and one-half months later.

■ The Rileys also allege that § 37-1505 requires an independent advisory board review of the foster care plan. We do not find the absence of this review to be fatal. At the time the Riley children were in the state's custody, there was no review board in Obion County, and even had there

been such a board, its "assessment and reports are advisory." T.C.A. § 37-1505 (Supp.1979).

■ The second weakness in the Riley's argument dealing with TDHS's failure to comply with the statutory requirements lies in their assertion that the available social agency (in this instance TDHS) did not make reasonable efforts to assist the parents in an effort to rehabilitate the family unit. See Tenn.Code Ann. § 37-246(e)(2) (Supp.1979). We do not take this to mean that a failure by TDHS to strictly comply with the foster care plan statute precludes a finding of "reasonable efforts" within the meaning of the parental rights termination statute.

■ The Riley's third issue is whether the visitation arrangements were conducive to achieving the goal of reuniting the family. They allege that TDHS did not fulfill its obligation with regard to maintaining a visitation program for them to visit their children. With regard to the sixth statutory requirement, the courts shall consider "whether the parent has maintained regular visitation with the children. 37-246(e)(6) Admittedly, Mrs. Riley inquired numerous times about the children and visiting with them. Difficulties arose because the Rileys had no telephone, seldom had transportation, and the children were in homes, many of which were not in Obion County. Testimony indicates TDHS did its part in arranging reasonable visitation up until the time that the state began termination of parental rights proceedings.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

At the conclusion of the evidence the trial court, as required by statute, filed written findings of fact. From our examination of the record we do not find that the evidence preponderates against the trial court's written findings that TDHS made

---

**3.** These sections are now 37–2–403, 37–2–404 and 37–2–406 (1984) respectively.

reasonable rehabilitative efforts pursuant to an adequate foster care plan, that TDHS fulfilled its obligation in helping the parents arrange visitation and transportation, and that the best interest of the children require termination of their natural parents' rights.

We point out, as the trial judge did, that the Rileys had notice of all proceedings and were either represented by counsel or had matters explained to them so that they understood as well as they were capable of understanding. The children also had a guardian ad litem during the time the termination proceedings were taking place.

We are not unmindful of the trauma involved in removing children from their natural parents and in terminating those parents' rights. Neither do we intend to say that children should be placed with foster and/or adoptive parents simply because those parents can provide more material possessions and opportunities for them than can their natural parents. We base our holding in this case upon what we have found in the record that indicates that for physical safety and psychological maturation the best interest of Peggy Lee and Charles Riley will be best served by upholding the trial court's decision and the rights of their natural parents should be permanently terminated.

Accordingly, the judgment of the trial court is affirmed, costs are assessed against TDHS, and the case is remanded for further proceedings as necessary.

TOMLIN, J., concurs.

NEARN, P.J., W.S., dissents.

NEARN, Presiding Judge, Western Section, dissenting.

I respectfully dissent from the opinion of my brothers.

I agree for the most part with the facts and conclusions as set forth in the majority opinion. It is the majority's disposition of the issue on appeal with which I am primarily in disagreement.

The record shows without a doubt that the conditions in which the Riley children lived at the time they were placed in the custody of the Department of Human Services were such that if they were compared with the conditions described in Erskine Caldwell's *Tobacco Road*,[1] Caldwell's conditions would seem like Fifth Avenue, New York, in comparison with the Rileys' circumstances. Further, I find that the Rileys' circumstances at the time of trial, although improved, were dismal at best. Even with these admissions, I must still dissent.

An understanding of my dissent requires that we examine the statutes by which TDHS acquired custody in addition to examining the statute under which the Rileys' parental rights were forever terminated. TDHS acquired custody because the Riley children were found to be "dependent and neglected" within the meaning of the laws. From the reports filed, it is evident that, insofar as Mrs. Riley is concerned, the children qualified as dependent and neglected under T.C.A. § 37-1-102(10)(B) (Supp.1984), because Mrs. Riley, by reason of "mental incapacity," was unfit to care properly for the children. As to Mr. Riley, it would seem that because of his inability to provide financially for his family subsection (10)(G) of the statute would have application.

A fair reading of this entire record impels one to the conclusion that the cause of the conditions which have existed and now exist is the mental incapacity of Mrs. Riley and the inability of Mr. Riley, try as hard as he might, to procure an adequate income. Mrs. Riley is moderately retarded and has been tested as having the mentality of a seven year old. Mr. Riley is, at best, a borderline case. The psychologist who examined Mr. Riley measured his I.Q. at 72; he further testified that a finding of less than 70 qualified the subject for the designation of mentally retarded and that there was a 3 per cent margin of error in the 72 rating given Mr. Riley. Therefore, if the error in Mr. Riley's I.Q. were on the high side, Mr. Riley would be considered to be mentally retarded. On top of that, Mr. Riley has a limited formal education. It

1. Erskine Caldwell, *Tobacco Road* (Cambridge, Mass., Bentley Pub. Co., 1970).

ended at the seventh grade. Because of all of this, Mr. Riley has been able to obtain only menial employment, seasonal in nature. The record shows that he is a willing worker and is trying to make an honest living. On occasions he has worked for less than minimum wage in order to try to better his family's living conditions. In short, he is playing the cards life has dealt him, the best he knows how to play them. He just was not dealt much of a hand.

There is nothing in this record to indicate that any of the existing conditions are the result of any willful act or willful neglect of either Mr. or Mrs. Riley. The record does show without doubt that both are doing their pathetic best to furnish a proper home for the children. Sad as it is, it must be admitted that their very best is simply not enough for the proper well being of the children. The record further shows that both parents love their children and want to have them with them and to be a family. One simply cannot read this record and not be emotionally moved. There are the many phone calls by the mother wanting to visit the children, but being unable to do so because of lack of transportation and the continued efforts of the father to obtain transportation and his inability to do so. At the time of trial he was making payments on a 1970 vehicle, but was unable to obtain possession until he had completely paid for it. However, no matter the pathos involved, a Court, insofar as *custody* is concerned, must look to the best interests of the children. This brings me to my disagreement with the majority over the issue presented by the case.

The best interest of the child is the paramount issue in the matter of custody. *Walker v. Walker*, (1983 Tenn.App.W.S.) 656 S.W.2d 11, 17. If this were simply a custody matter, there would be no dissent, for I believe the facts require that, for now, custody remain with the state. However, this is not a custody matter; it is a matter of the final termination of all parental rights of Mr. and Mrs. Riley. As noted in *Ex parte Wolfenden*, (1961 M.S.) 48 Tenn.App. 433, 348 S.W.2d 751, it is one thing to say to parents that they are deprived of custody; but it is an altogether different thing to say that they are no longer parents. Simply put, it is my opinion that before the state, operating through a Court, may say to parents that you may never see your child again, that you may never touch and embrace your child again, that you may never hear your child say "Mommy" or "Daddy" again, before the State can say all that, the parent must have willfully done something wrong.

The state has the right to terminate one's life only when some heinous wrong has been willfully done. If that be true, then under which constitutional power granted by the people does the state have the right, without a finding of willful wrongdoing, to terminate forever the parental relationship, which in most cases is more precious than life itself? I believe none exists. It certainly cannot be done under the guise of the best interests of the child. If that were so, then every child living in dire poverty would be subject to being taken away from poor parents so that they could be adopted by more affluent and equally caring parents. Our law clearly provides for the element of willfulness in abandonment cases. Even if a technical abandonment is shown, if the abandonment is not willful because of some circumstance such as incarceration, there can be no abandonment. *See* T.C.A. § 37–1–102(1) (Supp.1984). As has been said, honest poverty is no disgrace and is not a justifiable cause for the loss of fundamental rights such as the "freedom of personal choice in matters of family life." *See Santosky v. Kramer*, (1982) 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599. Neither is mental incompetence. If a mental incompetent commits an act that ordinarily would be considered a crime, the law does not consider it as such. Of course, such a person may be deprived of liberty when the person is a danger to himself or others, but even so, the deprivation of liberty is never considered in law to be permanent. The deprivation of liberty exists only so long as the mental condition exists. *See Jones v. United States*, (1983) 463 U.S. 354, 103 S.Ct. 3043, 3053, 77 L.Ed.2d 694. The law is ever hopeful that the condition will

change for the better, although it recognizes that such improvement may never happen. The point is that the sentence is not final. The termination of parental rights, however, is just as final as a death sentence.

In *Santosky v. Kramer, supra,* the Supreme Court of this nation recognized that, in parental termination matters, due process constitutional issues are presented. The termination is not to be decreed solely on the best interests of the child; parental rights must be considered as well.

In the instant case, custody was taken from the parents and placed in and retained by the state because of the failings of the parents. As stated, this was proper and I find in that action nothing offensive to my constitutional sensibilities. However, under our statutory scheme, if the "conditions which led to the removal ... still persists, [sic]" such persistent conditions may be the basis of a termination order. T.C.A. § 37-1-147(d)(1)(A) (1984). That statutory provision, applied to the facts of this case, means that the parental rights may be forever terminated because of the mental and monetary deficiency of the parents with no showing of any deleterious willful act of the parents. If these parents had been normal parents and then had suffered brain damage in an automobile accident and were unable to care for their children, would the state have the right to terminate parental rights because of the injuries? I think not. To take custody, yes, but not to terminate rights forever. The fact that these parents happen to have been born with their "injuries" is no reason for them to lose their right to see and know their children.

I would not hold the statutes involved facially unconstitutional, but I would hold that this case represents an unconstitutional application of the laws.

In closing, I cannot help but note that the record reveals that the children are now under the care of a couple who seem truly to love the children. They are caring for them without any financial support from the state. This fact makes this dissent even more difficult for me to write. I would hope that if some higher Court should agree with the position I take that the children would remain there. However, be that as it may, that which appears to be an unconstitutional deprivation of an inalienable right is, to me, paramount. Of course, the state in this case does not act out of bad motive; it has the best of motives, for now. If, however, a power is once recognized in the state to terminate parental rights forever without a finding of willfully deleterious acts on the part of the parents, such power would render meaningless other constitutional guarantees. As for me, I would forego all the others rather than give the state the power to deprive me forever of my right to see my children again without willful fault on my part.