| | |
|---|---|
| **BRENDA FARMER,** | ) |
| | ) |
| **Plaintiff/Appellant,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **DEPT. OF CHILDREN SERVICES,** | ) |
| | ) |
| **Defendant/Appellee,** | ) |
| | ) **Appeal No. 01A01-9610-JV-00485** |
| | ) |
| **THERESA FARMER/ESTES,** | ) |
| | ) |
| **Plaintiff/Appellant,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **DEPT. OF CHILDREN SERVICES,** | ) |
| | ) |
| **Defendant/Appellee.** | ) |

**FILED**

**December 30, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

## IN THE COURT OF APPEALS OF TENNESSEE
## MIDDLE SECTION, AT NASHVILLE

### APPEAL FROM THE DAVIDSON COUNTY JUVENILE COURT
### AT NASHVILLE, TENNESSEE

### HONORABLE ANDREW J. SHOOKOFF

Stacy L. Miller,
1808 West End Avenue, Suite 701
Nashville, TN. 37203
ATTORNEY FOR PLAINTIFF/APPELLANT (Theresa Carol Farmer-Estes)


Kathleen G. Morris,
P.O. Box 128091
Nashville, TN. 37212
ATTORNEY FOR PLAINTIFF/APPELLANT (Brenda Farmer)


John Knox Walkup
Attorney General and Reporter

Douglas Earl Dimond
Assistant Attorney General
General Civil Division
2nd Floor Cordell Hull Bldg.
425 Fifth Avenue, North,
Nashville, TN. 37243-0499
ATTORNEY FOR DEFENDANT/APPELLEE


### AFFIRMED AND REMANDED


WILLIAM B. CAIN, JUDGE

CONCURS:

HENRY F. TODD
PRESIDING JUDGE, MIDDLE SECTION

BEN H. CANTRELL, JUDGE

BRENDA FARMER,           )
                                )
       Plaintiff/Appellant,    )
                                )
vs.                           )      Appeal No. 01A01-9610-JV-00485
                                )
DEPT. OF CHILDREN SERVICES,    )
                                )
       Defendant/Appellee,    )
                                )
                                )
THERESA FARMER/ESTES,    )
                                )
       Plaintiff/Appellant,    )
                                )
vs.                           )
                                )
DEPT. OF CHILDREN SERVICES,    )
                                )
       Defendant/Appellee.    )

## O P I N I O N

These consolidated cases represent two separate family units running an essentially parallel course in the Juvenile Court of Davidson County.

Theresa Farmer Estes is the biological mother of three children to-wit: Raymond Ward Farmer, date of birth, 12-22-84; Amanda Marie Estes, date of birth, October 3, 1988 and Thomas Dwayne Estes, date of birth, 12-12-90.

Brenda Farmer is the wife of Walter Tom (Tommy) Farmer and the biological mother of Anthony Farmer, date of birth, 4-29-82; Bryan Farmer, date of birth, 8-18-83; and Peggy Farmer, date of birth, 11-23-84.

At the time the Tennessee Department of Children Services first intervened in these cases in early November of 1994, the members of each of these two family units were among a total of about twenty (20) people living in a house on Lishey Avenue in Nashville.

The "head" of this "household" was Novella Farmer, mother of Theresa Farmer/Estes and Walter Tom "Tommy" Farmer and thus maternal grandmother of the

2

three children of her daughter, Theresa Farmer/Estes and paternal grandmother of the children of her son Walter Tom "Tommy" Farmer.

Before proceeding to separate considerations of these two family units, it is well to observe, that one of the crucial findings of fact made by Judge Shookoff, in both of these cases, is undisputed and indeed conceded by all parties. Judge Shookoff found:

> "At the time of the children's removal, the family was living in an overcrowded home that at times had more than twenty (20) people staying in it. The physical conditions of the home were deplorable-dirty, bug infested, and unsanitary. The children were filthy and had ringworm and lice, all associated with these unsanitary conditions and lack of parental attention to the children's hygiene".

After an extensive consolidated trial, the Juvenile Court of Davidson County, terminated the parental rights of Theresa Farmer/Estes and Brenda Farmer under T.C.A. §36-1-113 (g)(3).

T.C.A. §36-1-113 (g)(3) provides verbatim as follows:

> (g) Termination of parental or guardianship rights may be based upon any of the following grounds:
>
> . . .
>
> (3) (A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (I) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's return to the care of the parent(s) or guardian(s), still persist;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be returned to the parent(s) or guardian(s) in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home."

T.C.A. §36-1-113 further delineates mandatory restraints upon the Court in termination proceedings:

> "(c) Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination or (of?) parental or guardianship rights have been established; and

3

(2) That termination of the parent's or guardian's rights is in the best interests of the child."

The consolidated termination trial consumed four (4) nonconsecutive days before the Juvenile Judge of Davidson County, same being respectively, March 29, 1996, April 11, 1996, April 30, 1996 and June 13, 1996. The trial judge then took the consolidated cases under advisement and on July 29, 1996, filed separate Memorandums and Findings of Fact in each case, terminating parental rights in both cases.

Brenda Farmer and Theresa Farmer/Estes filed separate appeals which were consolidated for argument and consideration by the Court of Appeals.

While the issues presented on Appeal are the same and the standard of review by this Court is the same as to each of the cases and much of the proof is applicable to both cases, it is necessary to the fair and orderly administration of justice that the cases be considered separately in Appellate review.

Before proceeding to separate review, it is well to establish the rules of law applicable to a termination of parental rights under T.C.A. §36-1-113(g)(3) and T.C.A. §36-1-113(c) as such rules control the disposition of both cases.

In <u>Tennessee Department of Human Services v. Riley</u> 689 S.W.2d 164, 165 the Court of Appeals, relying on codification existing in 1984 held:

> "[1] Thus, in order to terminate parental rights under subparagraph (1) of Section 37-246 (d) the court must find five elements: (1) The termination must be in the best interest of the children. § 37-246 (d); (2) The children must have been removed from the custody of the parent by the court for at least one year. § 37-246 (d)(1); (3) The conditions which led to the removal must still exist. § 37-246 (d)(1)(A); (4) There must be little chance that these conditions will be remedied so that the children can be returned to the parent at an early date. § 37-246 (d)(1)(B); and (5) The continuation of the parent-child relationship must greatly diminish the children's opportunities for early integration into a stable and permanent home. § 37-246 (d)(1)(C). Each requirement necessary for a termination under this subparagraph must be found by clear and convincing evidence. Santosky v. Kramer, 455 U.S. 745, (1982)."

These are the same termination rules today existing under T.C.A. §36-1-113.

1. The termination must be in the best interest of the children. T.C.A. §36-1- 113(c)(2);

2. The children must have been moved from the custody of the parent by the Court for at least six (6) months T.C.A. §36-1-113(g)(3)(A);

3. The conditions which lead to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's return to the care of the parents or guardians still persists T.C.A. §36-1-113(g)(3)(A)(I).

4. There is little likelihood that these conditions will be remedied at an early date so that the child can be returned to the parent or guardian in the near future T.C.A. §36-1-113(g)(3)(A)(ii).

5. The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home T.C.A. §36-1-113(g)(3)(A)(iii).

6. A finding by the Court by clear and convincing evidence that the grounds for termination or (of?) parental or guardianship rights has been established T.C.A. §36-1-113(c)(1).

While the rules of *Riley* differ slightly from T.C.A. §36-1-113(c)(g) the five (5) fundamental conditions for termination of parental rights are the same and the "clear and convincing evidence" rule is the same.

Thus it is seen, that the *Riley* rules survived almost verbatim the massive recodification necessitated by the enactment of Chapter 532 of the Public Acts of 1995, which, among many other things, converted former T.C.A. §37-246(d) into the present T.C.A. §36-1-113 et seq.

CONDITIONS LEADING TO THE REMOVAL OF THE CHILDREN

The record of the actual consolidated termination trial before the Juvenile Judge of Davidson County is preserved by a four volume verbatim transcript. The evidence supporting or opposing the initial Juvenile Court decision to remove the children from parental custody is not preserved for review by this Court and it is thus, conclusively presumed on Appeal in the absence of such a transcript that the evidence supports the decision of the Trial Court. Cooper vs. Rosson 509 S.W.2d 836, 837 and Irvin vs. City of Clarksville 767 S.W.2d 649, 653.

The lack of a verbatim transcript of evidence concerning the removal of the children from parental custody does not seriously affect the issues presented for review by the Appellants as the squalid and deplorable conditions leading to such removal are established by the Orders of the Juvenile Court and are indeed not disputed by the Appellants. It is the subsequent persistence of the conditions which led to the removal of the children that forms the primary basis for Appeal in both cases.

On the 29th of July, 1996, the Trial Judge in each case, entered an extensive finding of facts and conclusions of law, resulting, in both cases, in termination of parental rights pursuant to T.C.A. §36-1-113(g)(3).

The conditions which led to the initial removal of Anthony, Bryan and Peggy from the custody of their parents, Brenda Farmer and Walter "Tom" Farmer, were determined by the Trial Court at follows:

> "Anthony, Bryan and Peggy came into foster care in November of 1994, pursuant to an emergency removal, arising out of allegations that Peggy and her cousin had been sexually abused by two uncles, Robert Farmer and Terry Farmer, and that Mr. and Mrs. Farmer permitted the uncles to continue to have access to the children even after they were made aware of the allegations of abuse.

> On December 14, 1994 an agreement was reached regarding the adjudication and disposition of the neglect and abuse allegations. The Court found Peggy to be a victim of child sexual abuse and the victim of severe child abuse in that she was sexually abused by her uncles. In addition, Peggy, Anthony and Brian were found to be dependent and neglected children in that the home that they were living in with their parents was unsuitable for habitation, that the children were infested with head lice and ringworm, and that they had no personal hygiene skills. Legal custody of the children remained with the Tennessee Department of Human Services.

> . . .

> The specific allegations which resulted in the emergency removal concern the sexual abuse of Peggy and her cousin by their uncles and the failure of the parents to keep the children away from the uncles pursuant to the safety plan. However the 'conditions which led to removal' encompass a constellation of parenting deficits which interfered with the parent's ability to perceive and respond to risks to the health and safety of their children.

> At the time of the children's removal, the family was living in an overcrowded home that at times had more than twenty people staying in it. The physical conditions of the home were deplorable-dirty, bug infested and unsanitary. The children were filthy, and had ringworm and lice, all

6

associated with theses unsanitary conditions and lack of parental attention to the children's hygiene. The boys lacked personal hygiene skills and Peggy lacked hygiene opportunities.

The constant flow of other adults in and out of the home, the familiarity with the character of the uncles, the drug use that went on, even if the parents did not participate, should have alerted the parents to the risks such living conditions presented. Not only did the parents expose their children to conditions that would place any child at risk, but they also failed to recognize the special vulnerability of their two sons, whose special needs required that they get added attention."

As to the children of Teresa Farmer/Estes the Trial Court held:

"Raymond, Amanda and Thomas came into foster care in November of 1994 as a result of an emergency removal arising out of allegations that Amanda and her cousin had been sexually abused by two uncles, Robert Farmer and Terry Farmer, and that Ms. Estes permitted the uncles to continue to have access to the children even after Ms. Estes was made aware of the allegations of abuse.

On December 14, 1994 an agreement was reached regarding the adjudication and disposition of the neglect and abuse allegations. The Court found Amanda to be a victim of child sexual abuse and the victim of severe child abuse in that she was sexually abused by her uncles. In addition, Amanda, Raymond and Thomas were found to be dependent and neglected children in that they were living in a home with Ms. Estes that was unsuitable for habitation, that the children were filthy and infested with head lice and ringworm, and that they had no personal hygiene skills. Legal custody of the children remained with the Tennessee Department of Human Services.

. . .

The specific allegations which resulted in the emergency removal concern the sexual abuse of Amanda and her cousin by their uncles and the failure of Ms. Estes to keep the children away from the uncles pursuant to the safety plan. However the 'conditions which led to removal' encompass a constellation of parenting deficits which interfered with Ms. Estes ability to perceive and respond to risks to the health and safety of her children.

At the time of the children's removal, the family was living in an overcrowded home that at times had more than twenty people staying in it. The physical conditions of the home were deplorable-dirty, bug infested and unsanitary. The children were filthy, and had ringworm and lice, all associated with theses unsanitary conditions and lack of parental attention to the children's hygiene.

The constant flow of other adults in and out of the home, her familiarity with the character of the uncles, the drug use that went on, even if Ms. Estes did not engage in it, should have alerted Ms. Estes to the risks such living conditions presented. Not only did Ms. Estes expose their children to conditions that would place any child at risk, but they also failed to recognize the special vulnerability of their two sons, whose special needs required that they get added attention."

Thus it is seen, as to all of the children involved in these consolidated cases, that the "conditions which led to removal" are precisely the same and are not the subjects of

7

Appellate review sought by either Walter and Brenda Farmer, on the one hand, or

Theresa Carol Farmer/Estes on the other.


### THE APPEAL OF BRENDA AND WALTER FARMER


Brenda and Walter Farmer assert the following issues on Appeal to-wit:

1.      The Trial Court erred in finding that the Department of Children's Services proved by clear and convincing evidence of the persistence of conditions which led to removal of Brenda Farmer's children or which        would subject her children to further neglect with little likelihood of        early remediation.

2.      Assuming, arguendo, that the Trial Court properly found clear and convincing evidence of a violation of T.C.A. §36-1-113(g)(3), the Trial Court erred in finding clear and convincing evidence that it is in the children's best interest for Brenda Farmer's parental rights to be terminated because termination would preclude the legal right to visitation.

3.      Terminating Brenda Farmer's parental rights to her children violates the Tennessee and United States' fundamental, constitutional right to parent one's children.


The evidence is clear and convincing that the conditions which led to removal in

the first place persisted from the date of the Settlement Order of December 14, 1994

through the four day termination hearing in the Spring and Summer of 1996 resulting in

the Termination of Parental Right's Order of July 29, 1996.  Likewise, clear and

convincing evidence establishes that the children would be subject to further neglect with

little likelihood of early remediation.


First of all, Walter and Brenda Farmer admitted that Peggy Farmer had been the

victim of sexual abuse by her uncles and agreed that the children were dependent and

neglected.  These admissions are part of the Settlement, entered December 14, 1994,

whereby the three children, Anthony, Bryan and Peggy were placed in foster care.


Dr. Victor A. Pestrak, a licensed psychologist performed a comprehensive

parenting assessment as to both Mr. and Mrs. Farmer with an evaluation date of July 13,

1995.  At the termination hearing, he testified:

> ". . .it was my recommendation that the children not be returned to Mrs.
> Farmer's sole care at this time.

In fact, if they were placed in her sole care, they would be at serious potential risk for physical and psychological injury. This does not mean that there is any evidence from this evaluation that Mrs. Farmer would purposely harm her children, rather there is no evidence that she would act properly in an effort to protect them should that be needed."

In his evaluation of Mr. Farmer, occurring seven months after admitted sexual abuse and dependence and neglect, Dr. Pestrak observes:

"When asked about DHS involvement with his family, Mr. Farmer offered, 'nobody is telling me nothing.' When pressed he said his daughter reported being sexually abused by an uncle to a school official. He adds that his daughter did not disclose to him or his wife. When asked directly he acknowledged that previous to this DHS had taken steps to remove his son for serious neglect ('the doctor told lies about me').

Mr. Farmer was very reluctant to discuss his daughter's molestation. This was not in a protective manner, as he spoke at length negatively about DHS, his two brothers, the court system, and the detective. Rather, he was evasive regarding how often she was abused and when. He initially said she was abused one time. When pressed, he said it happened three times. His comments conflicted with those of his wife.

He insisted he did not break the safety agreement but that DHS people said he did, When 'if he was responsible at all for any of his family's trouble he was firm and stated, 'none of it is my fault.' When asked who is at fault he listed the detective, his daughters (for not telling him), and DHS. When reminded about the perpetrators he said, 'it is all my brothers' fault.'

During the interview it was clear that Mr. Farmer demonstrated no remorse for his daughter's molestation (even if he was helpless regarding it). He expressed no sympathy for his children's neglect of abuse. He emphasized blaming others rather than correcting any trauma, hardship, or neglect.

. . .

In sum, there is no indication that Mr. Farmer admits any wrongdoing or personal flaws at all. He feels no need to change any of his parenting behaviors. Rather than perceive DHS involvement as an indication that he can improve his parenting skills, he sees them as yet another person/agency to project blame onto. Prognosis for any meaningful change is very low."

Further in his evaluation as to Mrs. Farmer, Dr. Pestrak observes:

". . .Ms. Farmer accepts no personal responsibility and acknowledges no shortcomings at all. Her strong dependency results in her perception that Mr. Farmer gives her more social support than most spouses. This is not likely given her husband's emotional limitations (see his report). However, this belief will certainly affect Mrs. Farmer's behavior, submissiveness, and strong sense of loyalty to him.

. . .

At this time it is not recommended that the children be returned to Ms. Farmer's sole care. Doing so presently will place the children at serious

potential for physical and psychological injury due to neglect. If the children were returned at this time we should expect that the previous reported problems with improper hygiene and failure to protect will continue."

The foregoing extensive evaluation by Dr. Pestrak is supported by psychologist Dr. Ray Potts called as a witness on behalf of Mr. and Mrs. Farmer. When asked at the termination hearing, whether or not proper therapy or counseling would help Mr. and Mrs. Farmer, Dr. Potts responded:

"It's possible but I don't think it's probable. And I say that because this has been going on for a long time and they still aren't anywhere near accepting that responsibility.

Q.    Is that a matter of their own limitations?

A.    Yes."

Mr. Farmer has not appealed from the Trial Court judgement, but continues as the dominant partner in the marriage of the parties, and would be the co-custodial parent upon restoration of custody to the Farmers.

The record shows clearly that the children have benefitted immensely from foster care.

The standard of review by this Court of a decision terminating parental rights is de novo upon the record with the presumption of correctness of the findings of fact by the Trial Court (In Re: Drinnon 776 S.W.2d 97, Tenn. 1988).

Applying this standard to the extensive Trial Court record in this case, this Court finds that clear and convincing evidence demonstrates that the Trial Court correctly terminated the parental rights of Walter and Brenda Farmer under the provisions of T.C.A. §36-1-113(g)(3) and equally demonstrates that such termination is in the best interest of the children.

THE APPEAL OF THERESA FARMER/ESTES

As in the Brenda Farmer case, Theresa Farmer/Estes does not take issue on Appeal with the facts causing the original removal of her children from her custody. The deplorable conditions existing in the Lishey Avenue home are not disputed and the issue before this Court relates to the persistence of those conditions after removal.

The Trial Court in its July 29, 1996 finding of fact asserted that which is crucial to the determination of the issues on Appeal.

> "There are two related question that are determinative of whether the children can be safely returned to Mrs. Estes:
>
> First, has Mrs. Estes developed special appreciation of the problems that brought the children into care so that she recognizes both the problems and the role that she played in those problems and second, has she developed the skills and incites necessary to provide a safe environment for the children.
>
> Mrs. Estes has attended some parenting classes. She has attended some counselling. She has complied with visitation. She has cooperated with psychological evaluations and parenting assessments. She has finally moved out of her mother's home. She has thus substantially complied with the plan of care.
>
> Nonetheless, in her testimony before the Court and in her conversations with others, Mrs. Estes does not appear to either agree that the emergency removal was neccessary nor acknowledged the problems that her living situation presented. Despite this Court's previous findings and the testimony in this proceeding, she was not able to acknowledge any wrongdoing on her part or any deficits in the way she was raising her children. She did not recognize any of the children's special needs or show any understanding of what special action she would need to take to meet these needs. Although the Court previously found that her brother, Walter Farmer, sexually abused both Amanda and Raymond, Mrs. Estes does not believe that to be true. Mrs. Estes remains very much susceptible to influences of other family members, including her mother, who has consistently denied that any abuse occurred."

The ability of this Court to adequately review this case on Appeal is compromised by the state of the record. For instance, the psychological assessment of Dr. Victor Pestrak as to Theresa Farmer/Estes was admitted in evidence as an exhibit to his testimony, but such report is not found among the exhibits in the record. The notes of Mrs. Lucinda Pincince, the clinical therapist at Luton Mental Health Center, relating to Theresa Farmer/Estes, were admitted into evidence at the time of her testimony, but such notes do not appear as exhibits in the record before this Court.

Dr. Pestrak testifies that he found:

11

> "no indication that Mrs. Estes feels that she is at fault in the serious allegations made against her. Similarly she feels that she has no limitations in terms of parenting, and so there would be nothing to focus on in terms of becoming a better parent. . . through the counselling process"

He further testifies that the rigidity of Mrs. Estes thinking would block therapy because it would prevent her from recognizing that she had a problem. He further asserts that Mrs. Estes could have benefitted from counselling subsequent to his assessment, but that she is not a good candidate for counselling and progress because as of the date of his testimony in the termination hearing, she remained in complete denial and saw absolutely nothing wrong with her own parenting skills and thus, did not need counseling.

Mrs. Pincince, who was her weekly clinical therapist, testified that Mrs. Estes continually denied that her daughter had been sexually abused and Mrs. Pincince wrote a letter to the Department of Children Services on January 17, 1996, pointing out the inconsistencies relative to the recognition of sexual abuse of her children.

Olen Winningham, who was the ACCT worker throughout the Estes case, testified from the plans of care as to Mrs. Estes and her children asserting that although Mrs. Estes had complied with most of her responsibilities under the original plan of care, that her low level of functioning and attachments to her family rendered it unlikely that she would ever be able to function as a care giver for her children. She was much dominated by her family and apparently unable to prevent the sexual abuse that occurred to her children because of members of her family. Finally, Mrs. Estes in her own testimony of June 13, 1996, after the more than two years of involvement by the Department of Children Services and the repeated findings of the Trial Court relative to sexual abuse of her children by her brothers, testified:

> "Q.    Why do you think the children were taken away from you?
>
> A.    I really don't know."

While Mrs. Estes agreed to the findings of abuse and neglect as to her children in the December 14, 1994 Order of the Juvenile Court, the record demonstrates a contrary pattern of willful denial by Mrs. Estes of any of the conditions that brought about the

12

initial removal and either an inability to come to grips with the obvious effects of the sexual abuse perpetrated on her children by her brothers or if recognizing such to exist and inability to protect the children from such continued abuse.

Thus, the record fully supports the testimony of Dr. Pestrak that Mrs. Estes was cognitively and psychologically unlikely to benefit from counselling, especially because of the rigidity that led her to deny any fault or responsibility for the children' neglect and abuse and made her unable to recognize abuse indications.

Clear and convincing evidence supports the action of the Trial Judge in terminating the parental rights' of Theresa Farmer/Estes under T.C.A. §36-1-113(g)(3).

The record likewise establishes by clear and convincing evidence that removal is in the best interest of the children. All of the children have benefitted enormously from foster care.

Because Mrs. Estes continued to deny the childrens' problems and her role therein, because she was unable to recognize indicators of abuse and thus protect her children; because the children thrived in foster care and because only after termination could the children be adopted into a nurturing environment, the Juvenile Court correctly concluded that termination of parental rights' was in the childrens' best interest.

Mrs. Estes complains that the Department did not make reasonable efforts to reunify the family before seeking to terminate parental rights. This assertion is without support in the record. The State and Mrs. Estes entered into a foster care plan on November 19, 1994, under which Mrs. Estes agreed to psychological assessment, to parenting classes, to visitation and to acquiring and maintaining a suitable home, every assistance possible was given to reunite the Estes family and Mrs. Estes attempted to comply with her responsibilities under the plan. The record shows however, that she continues to in effect deny that any problem ever existed to start with and thus little or no progress was possible, no matter what efforts the Department of Children Services made.

13

## CONCLUSION

This case has been kept under advisement for an inordinate period of time for two reasons.

First of all, the consolidated record before the Court in both termination trial testimony and the pre-termination hearing record of proceedings is complex, confusing and very difficult to decipher in any organized fashion.

Secondly, and more importantly, is the specter inherent in every case where the Court is called upon to terminate parental rights. This is poignantly stated by Judge Nearn in his dissent in Tennessee Department of Human Services v. Riley 689 S.W.2d 164, 172:

> "The state has the right to terminate one's life only when some heinous wrong has been willfully done. If that be true, then under which constitutional power granted by the people does the state have the right, without a finding of willful wrongdoing, to terminate forever the parental relationship, which in most cases is more precious than life itself? I believe none exists. It certainly cannot be done under the guise of the best interests of the child. If that were so, then every child living in dire poverty would be subject to being taken away from poor parents so that they could be adopted by more affluent and equally caring parents. "

It cannot be said, however, that the General Assembly of Tennessee has failed to recognize and take into consideration the potential for injustice so eloquently pointed out by Judge Nearn. The statutory scheme recognizes that the States' interest in protecting children:

> ". . .must be tempered by a parent's constitutionally protected privacy interests in raising his or her children free from unwarranted governmental interference thus, a parent's rights may be terminated only when the continuation of the relationship between the parent and the child poses a substantial threat of harm to the child."
>
> In the matter of Jeremy D. and Nathan D.           Appeal No. 01-A-01-9510-JV-00479 (Tenn.App May 17, 1996).

Further protection is added by the "clear and convincing evidence standard" by which both the Trial Courts and Appellate Courts are bound. In both of these consolidated cases at bar, this Court is satisfied that the Juvenile Court of Davidson

14

County has acted with meticulous care with a thorough and scholarly consideration of all issues. The Juvenile Court has seen and observed the manner and demeanor of all witnesses testifying before it in the termination hearing as well as carefully "nurse maiding" these cases for more than two years before coming to its ultimate conclusion. That conclusion is in all respects supported by clear and convincing evidence and the judgement of the Juvenile Court of Davidson County is all respects affirmed.

_____

**WILLIAM B. CAIN, JUDGE**

**CONCUR:**

_____

**HENRY F. TODD,**
**PRESIDING JUDGE, MIDDLE SECTION**

_____

**BEN H. CANTRELL, JUDGE**

15