IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs, September 10, 2004

## IN RE A.Y.M., AND A.N.W, JR.

**Appeal from the Juvenile Court for Wilson County**
**Nos. 4225 & 4488     Barry Tatum, Judge**

---

**No. M2004-00313-COA-R3-PT - Filed March 7, 2005**

---

A.N.W., Sr., father, alone appeals the termination of his parental rights as to two children, A.Y.M. and A.N.W., Jr., the youngest of which had been removed from parental custody at birth due to the child's addiction to cocaine.  A.N.W., Sr., challenges the trial court's findings that DCS exercised reasonable efforts to provide family services, that A.N.W., Sr., failed to substantially comply with permanency plan goals, that A.N.W., Sr., had abandoned these two children, and that the best interest of the children required termination of parental rights.  We affirm the trial court's findings in all respects and remand the case for such other proceedings as may be necessary.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed.**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Debra L. Dishmon, Lebanon, Tennessee, for the appellant, A.N.W., Sr.

Paul G. Summers, Attorney General and Reporter; Juan G. Villasenor, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

David Kennedy, Lebanon, Tennessee, guardian ad litem for A.Y.S. and A.N.W., Jr.

## OPINION

A.Y.M. was five years old when A.N.W., Jr. was born addicted to cocaine.  These circumstances surrounding A.N.W., Jr.'s birth led to the Department of Children's Services' (DCS) investigation into alleged dependence and neglect.  This investigation revealed, and the parties do not dispute, that prior to the birth, A.Y.M., Mother, A.N.W., Sr.,[1] and the paternal grandmother, all occupied the same residence.  Seventeen months later, when the Department filed its petition to

---

[1]The children were born out of wedlock with biological parentage of A.N.W., Sr., being subsequently established by court-ordered DNA testing.

terminate Mother's and A.N.W., Sr.'s, parental rights as to the children, Mother had all but disappeared. A.N.W., Sr., the only parent remaining in contact with DCS and the children, had occupied three different residences within that same time frame and worked at three different jobs. He had tested positive for controlled substances 11 of 13 times, and within the three months preceding the petition's filing tested positive two out of three times with one of those positive results being for cocaine.

As part of the investigation begun in December 2001, DCS conducted a study of the residence occupied as described above. The condition of the home was, in the words of the case manager Stephanie McGuire, "Horrendous." The Department, through its child protective services, instructed A.N.W., Sr., and the paternal grandmother to clean the home in preparation for A.N.W., Jr.'s, arrival from the hospital. Shortly after the birth, DCS conducted three visits of the parties' residence at 55 Upton Heights, Lebanon, Tennessee. Child Protective Services was accompanied on one of those visits by representatives from the Fire Department and Police Department of Lebanon. Carol McGuffy, case manager for Child Protective Services, testified at trial before Juvenile Court Judge Tatum that this visit revealed several fire hazards, presence of digital scales, an eight-inch bladed knife and several cigarette butts, apparently remnants of marijuana cigarettes. On Jan. 9, 2002, the Department developed a plan of action requiring the parents to remove the fire hazards from the residence with the help of the paternal grandmother. By the time the newborn and Mother arrived at the residence on Jan. 24, 2002, McGuffy, who had opened the investigation, had determined that sufficient progress had been made in the cleaning of the residence. Unfortunately, on Feb. 7, 2002, McGuffy had received a report from the paternal grandmother that the mother had left the home and disappeared. Twelve days later, the infant, A.N.W., Jr., was hospitalized for a two-night stay. Shortly after the child arrived home from the hospital the second time, Carol McGuffy returned to the home to find that the conditions had deteriorated:

> Q:  And what were your observations of the home at that time?
>
> A:  The conditions of the home had deteriorated including one of the violations that were noted in the fire marshal's report, that there would not be any extension cords used in the home at all, that everything had to be directly plugged in. And at the time there was a strip, a power strip that was found in [A.N.W., Sr.'s] bedroom where it had been previously.
>
> There was also chemicals in the kitchen mixed with food. Even though the home was better than it had been originally, it was not appropriate for the child, any newborn child, let alone a child with [A.N.W.], Jr.'s medical condition.

The children were removed from the home pursuant to an emergency petition for custody, apparently granted on Feb. 22, 2002.[2] Following the removal, a preliminary hearing was held on Feb. 27, 2002, which resulted in the finding of dependence and neglect. The court required the appellant, [A.N.W.], Sr., to submit to DNA testing to establish biological parentage. The court further ordered:

> 3. That the alleged Father, [A.N.W., Sr.] shall maintain a safe and clean home for a minimum of three months. The Department of Children's Services will conduct random home visits at least twice per month. The children shall not be returned to the home until said housing has been maintained for three consecutive months.

> 4. The Court finds that the Mother, [N.M.] shall establish and maintain clean and safe housing for a minimum of three months. The Department of Children's Services will conduct random home visits at least twice per month. The children shall not be returned to the home until said housing has been maintained for three consecutive months.

> 5. The Court finds that both parents, [N.M.] and [A.N.W., Sr.] are in need of a parenting assessment; psychological assessment; alcohol and drug assessment and shall follow any treatment recommended.

> 6. That both parents shall demonstrate the ability to provide financial support for themselves and children.

> 7. The Court has ordered that the Department of Children's Services shall perform random drug screening on each of the parents, and that the parents shall submit to these random drug screens.

> 8. That the Department of Children's Services shall make a referral to Homemaker Services on behalf of [A.N.W., Sr.].

> 9. The Department of Children's Services shall assist with referrals for services and assessments. Parents shall be responsible for following through with said referrals. Parents shall maintain regular contact with the Department of Children's Service Case Manager.

> 10. That each parent shall pay $30.00 per week, child support to the Central Receipting Unit, Post Office Box 305200, Nashville, Tennessee 37229, effective March 8, 2002.

---

[2]The record lacks a copy of the Order granting the removal.

11.  That both parents shall have one hour per week supervised visitation with the minor children at the Department of Children's Services office located at 712 N. Cumberland Street, Lebanon, Tennessee 37087 at a time to be set up by the children's case manager.

12.  That a CASA Advocate be appointed to this case.

**13.  The Adjudication and Ratification Hearing is set for April 5, 2002 at 9:00 a.m.**

The adjudicatory and ratification and hearing occurred on April 5, as ordered, at the conclusion of which the juvenile court entered its Order of April 18, 2002, finding in pertinent part:

Upon the evidence presented and the entire record, from all of which the Court finds that the children, [A.Y.M.] and [A.N.W., Jr.] are dependent and neglected children within the meaning of the law by agreement of all parties.

The Court further finds that it [is] contrary to the children's welfare to remain in the care, custody, or control of their parents due to Mother's unstable housing and employment and drug addiction and [A.N.W., Sr.]'s inadequate housing; there is no less drastic alternative to removal; all reasonable efforts have been made and services have been rendered to prevent or eliminate the removal of said children from their home, such efforts including two failed safety plans that were established in January, 2002 and Homemaker's Services; and it is in the best interest of the children, and the public as follows, and **IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED:**

1.  That the Permanency Plan dated March 18, 2002 written and submitted by the Department of Children's Services is hereby ratified by the Court as written. The goal is reasonable and the services are reasonably related to the achievement of that goal.

2.  That the parents, [N.M.] and [A.N.W., Sr.], shall each pay $50.00 monthly child support, per parent to the Central Receipting Unit, P.O. Box 305200, Nashville, Tennessee 37229 effective April 22, 2002. This is in deviation of the federal child support guidelines due to the necessity of compliance with other reunification services, court appearances and for the parent's to maintain a stable home for the children to return to.

3.  That the prior orders of the Court will remain in effect unless herein modified.

4.  That any matters not enumerated in this Order are reserved by the Court.

Subsequent to this Order, Homemaker Services, which had been prescribed in order to aid A.N.W., Sr., and paternal grandmother in cleaning and preparing the home for children, was terminated due to lack of success. On July 29, 2002, pursuant to notice that was issued July 12, the Department staffed a new Parenting Plan without the benefit of A.N.W., Sr.'s, presence, which required A.N.W., Sr., to complete parental and psychological assessments, follow through with all assessment referrals, keep all drug screens negative, maintain safe and clean housing, continue to attempt to work with Homemaker Services and pay child support as previously ordered by the court. This plan, with the permanency goal of returning the children to A.N.W., Sr., was approved on Sept. 6, 2002 and ratified by court order on Sept. 23. Despite the requirements of these plans, A.N.W., Sr., did not begin to pay child support until November of 2002, for A.N.W., Jr. Although he began payment earlier for A.Y.M., May 13, 2002, he ceased payment for her support on Dec. 2, 2002, having paid a total of $23.06 on that day. By his own admission, A.N.W., Sr., was well behind on his child support as of the filing of the petition to terminate his parental rights:

Q: Let's talk about the child support that you pay. How much child support have you paid to date?

A: I think it's around five or $600, somewhere like that.

Q: Five or $600?

A: I think. I'm not exactly sure because I've had it taken out of my checks. I've only paid it one time at the office and I paid $40 then.

Q: Okay, so then are you current with your child support payments?

A: No, ma'am, I'm behind because I was told my parental rights were already being cancelled so I figured, you know, by, you know, me not actually knowing, the judge had to cancel and I stood there and stopped paying.

Q: Are you saying somebody told you to stop paying your child support?

A: No, ma'am. I was told by Stephanie McGuire that my parental rights were already being cancelled so I just thought what was the point in keep on paying for something because I figured, I knew I had never been through this before, I'm not a lawyer.

Q: Okay, you have an attorney, don't you, [A.N.W.]?

A: Yes, ma'am.

Q:      Okay, it would have been a whole lot simpler to call Ms. Dishmon and ask Ms. Dishmon's legal opinion, wouldn't it?

A:      It would have.

Although A.N.W., Sr., claims to have paid almost $600 in support, the Department's records tell a different story. Case Manager McGuire provided the following version of A.N.W., Sr.'s, payment history:

Q:      Is this the child support printout that you received as far as [A.N.W., Sr.]'s payments on behalf of [A.Y.M.] and [A.N.W., Jr.].

A:      Yes.

Q:      And when is it showing that the last payment received?

A:      For [A.N.W.], Jr., was 4/7/03.

Q:      And what was that amount?

A:      Sixty-six – that he paid that day?

Q:      That he paid that day.

A:      $40.

Q:      And the total that he's paid on behalf of [A.N.W., Jr.], since he's been in custody?

A:      66.93.

Q:      And in regard to [A.Y.M.], the last date of payment for her was when?

A:      12/2/02.

Q:      And how much has he paid total for [A.Y.M.]?

A:      A hundred fifty-seven eighty.

Q:      Would you like to make this an exhibit to your testimony?

A:      Yes.

(Whereupon the previously mentioned document was marked as Exhibit No. 28 and entered into evidence.)

In it's Order of Sept. 23, 2002, in addition to ratifying the Permanency Plans dated July 29, 2002, the trial court made the following specific findings:

2.  The Department of Children's Services shall re-staff at the earliest possible date to include the concurrent goals of reunification/adoption. This is due to the parents lack of progress over the previous sixth [sic] (6) months.

3.  The Department of Children's Services made efforts to drug screen [A.N.W., Sr.] on September 3, 2002 but [A.N.W., Sr.] could not urinate. [A.N.W., Sr.] agreed to take a drug screen prior to leaving the Courthouse on September 6, 2002. Earl Berry, a Wilson county Youth Service Officer, administered the drug screen. After the drug screen was administered, Mr. Berry was sworn under oath and Mr. Berry stated that [A.N.W., Sr.] tested positive for Cocaine and Marijuana and that the results were furnished to both [A.N.W., Sr.] and his attorney, Debra Dishmon.

4.  The Court finds that [A.N.W., Sr.] needs to establish a stable residence with his name on the lease or note as he currently lives with his girlfriend.

5.  [A.N.W., Sr.'s] live-in girlfriend must participate in supervised visitation with [A.N.W., Sr.] and his children, prior to [A.N.W., Sr.] having any unsupervised visits, in their home.

6   That the prior orders of the Court will remain in effect unless herein modified.

7.  The Department shall complete a home study on [A.N.W., Sr.'s] and complete a criminal background check on his girlfriend.

8.  That the prior orders of the Court will remain in effect unless herein modified.

**9.  A Review in this matter has been set for January 10, 2003 at 11:00 a.m.**

On January 10, 2003, the trial court conducted another hearing to consider the Permanency Plans revised as of January 6, 2003. In its Order filed January 23, 2003, the trial court specifically found that the mother and A.N.W., Sr., were not in substantial compliance with the Permanency Plans. The trial court found that, despite recent progress, the parents' failure to obtain stable housing and employment coupled with their inability to remain drug free constituted a barrier to reunification. The trial court also specifically found that A.N.W., Sr., tested, once again, positive for marijuana and admitted to marijuana usage within the period. This Order, contained in Exhibit 20 and presented to the trial court in conjunction with the Quarterly Progress Report on Child in State Custody, was

also accompanied by the following note concerning the functioning of the children's family of origin with reference to the appellant:

> [F]ather, has consistently exercised his visitation rights with his children. [A.N.W., Sr.,] had a job working one day a week at Nashville Auto Auction, but he quit that job around 11/20/02 and stated to this case manager at a visit on 12/3/02 what was the point of working if he was not going to have money because all of his paycheck goes to child support. [A.N.W., Sr.,] has not informed this case manager that he has obtained employment however he was wearing a McDonald's uniform at the last visit on 12/31/02 and he left this visit early to go work. [A.N.W., Sr.,] states that he and his girlfriend, . . ., have broken up and he is now living back with . . ., his mother. [A.N.W., Sr.,] states his intentions are to obtain his own residence. [A.N.W., Sr.,] tested positive for cocaine and marijuana on three random drug screens (9/6/02, 10/29/02, & 12/3/02) and he tested positive for marijuana only on two others (11/19/02 & 12/17/02). [A.N.W., Sr.] has completed one A&D assessment that recommended random drug screens but due to his recent drug screen results the DCS case manager has scheduled another A&D assessment for 1/13/03. [A.N.W., Sr.] has completed all of his required assessments on the original Permanency Plan (Parenting Assessment, Psychological Evaluation, & A&D assessment, with another A&D assessment pending). [A.N.W., Sr.'s] completed assessments reports came back on 1/6/03 and recommend he not be considered as a custodian of his children at this time and also he needs to receive psychiatric treatment and psychotherapy. [A.N.W., Sr.] has been diagnosed with Axis I, Bipolar Affective Disorder (provisional), Axis II, Antisocial Personality Disorder, Axis III, none, Axis IV, Social/Interpersonal - severe, and Axis V, 55.

On May 23, 2003, the Department filed its petition to terminate the parental rights of the mother and A.N.W., Sr. The petition alleges, concerning A.N.W., Sr., his failure to support for four consecutive months prior to the filing of the petition, the failure of reasonable efforts to provide a suitable home for a period of four months following the removal of the children, the persistence of the conditions which led to removal, and the persistence of other conditions which would subject the children to further abuse and neglect, i.e. A.N.W., Sr.'s, drug usage and lack of appropriate housing and failure to substantially comply with reasonable responsibilities to remedy the conditions that necessitated the placement. This petition followed closely on the heels of the only parenting plan staffing that A.N.W., Sr., attended personally. It is at this date that A.N.W., Sr., makes his only child support payment since December of 2002; and, if his own testimony is to be believed, this payment is the sum and total of the support payments made in the year 2003, the petition to terminate parental rights having been heard in September and October of that year. At that hearing, the trial court considered lengthy testimony from Carol McGuffy, the initial case manager; Tracy Hawks, from Homemaker Services; Stephanie McGuire, another case manager who worked extensively with the parents concerning the custody of their children; Patricia Parker, employed with the Department of Children's Services Center for Adoption; Michelle Jones, resources coordinator for Onmivision, the level 2 therapeutic placement for the children; and, by deposition from Dr. Thomas Monroe, III,

PsyD, the licensed clinical psychologist who performed the parenting assessment and psychological evaluation of A.N.W., Sr. In addition, the trial court heard from A.N.W, Sr., the paternal grandmother, a paternal aunt whom the parents presented as a possible relative placement, Jerome Stewart, a minister and former coworker of A.N.W., Sr., and A.N.W., Sr.'s, girlfriend with whom he resided at the time of the hearing along with the girlfriend's cousin, the girlfriend's two children and the cousin's two children. It bears noting with emphasis that A.N.W., Sr.'s, inability to remedy certain conditions i.e., obtaining stable housing and dealing with his psychological and chemical issues, contrast and conflict with his intent as evidenced by his continued visitation with the children and his most recent attempts at rectifying these conditions that have existed more than a year prior to the filing of the Department's petition to terminate his parental rights. In its Order Terminating Parental Rights and Final Decree of Guardianship, the trial court noted this conflict:

13)     The issue of [A.N.W., Sr.]'s termination is more difficult. [A.N.W., Sr.] has maintained regular contact with his children. (See Trial Exhibit 30) He has visited regularly and unlike Mother, clearly has an interest in them. Moreover, in the four to six weeks prior to the termination hearing [A.N.W., Sr.] has begun to make some progress. Unfortunately, [A.N.W., Sr.] has wasted seventeen months and still is not significantly closer to meeting the goals first established in March 2002.

14)     [A.N.W., Sr.]'s actions throughout this unfortunate episode have been consistent. [A.N.W., Sr.] is not proactive and is dependent upon others for basic support. On March 15, 2002, [A.N.W., Sr.] met with Tracy Hawks of the Mid-Cumberland Human Resource Agency regarding Homemaker Services. Mrs. Hawks advised [A.N.W., Sr.] that moving out of his mother's home was an option. [A.N.W., Sr.] admits he understood that option if he was unable to convince his mother that the home's conditions had to improve. Ms. Hawks obtained a list of available apartments and rent information for units in Murfreesboro, TN at [A.N.W., Sr.]'s request. [A.N.W., Sr.] did not act on that information. Homemaker Services were discontinued after two months because of [A.N.W., Sr.]'s non-compliance and failure to attain any goal. [A.N.W., Sr.] agrees with Ms. Hawks that he knew finding better housing was one of his responsibilities. Furthermore, [A.N.W., Sr.] met with Ms. Hawks only one time and missed two subsequent scheduled meetings with her.

15)     [A.N.W., Sr.] now presents himself as having stable housing. [A.N.W., Sr.] has been living with a girlfriend and her two children. [A.N.W., Sr.] is not on a lease or mortgage with the girlfriend. [A.N.W., Sr.] admits and his girlfriend concurs that [A.N.W., Sr.] has moved back in with his mother from time to time. This occurs when

[A.N.W., Sr.] and his current girlfriend are having relationship difficulties. Furthermore, [A.N.W., Sr.] and his girlfriend are actually living at this time with a relative of the girlfriend and her two children. [A.N.W., Sr.] is not even living in the home of someone with whom he has a relationship.

16) [A.N.W., Sr.]'s drug use has been a concern from the start. In spite of being aware that his drug use was an issue, [A.N.W., Sr.] continued to use drugs regularly. [A.N.W., Sr.] testified that he even began using cocaine again as an escape from the burdens being placed on him by this court and DCS. [A.N.W., Sr.] testified that his drug use actually increased after his children were removed to DCS custody. [A.N.W., Sr.] testified that he began using drugs more frequently once he realized that he was going to have take responsibility for the children since the Mother could not or would not. This admission is ironic in light of the fact [A.N.W., Sr.] testified that his own experience of being in DCS custody as a juvenile was a positive experience.

17) [A.N.W., Sr.] has had two alcohol and drug assessments. Intensive inpatient treatment was recommended both times. This court told [A.N.W., Sr.] in January 2003 that he must choose between drugs or his children. DCS provided [A.N.W., Sr.] with information about a free alcohol and drug treatment program in April 2003. This is the same program [A.N.W., Sr.] entered and completed in late August and early September 2003. In spite of this knowledge, [A.N.W., Sr.] continued to use throughout most of the time his children were in DCS custody. [A.N.W., Sr.] tested positive for cocaine six out of seven times. (See Trial Exhibit #25) [A.N.W., Sr.] admits continuing to use drugs until after the Termination of Parental Rights petition was filed.

18) [A.N.W., Sr.] also uses his employment as an excuse for non-compliance with the tasks and goals set forth in the permanency plans and for failing to accomplish the listed goals. While regular employment and income was a goal, [A.N.W., Sr.] admits he failed to provide proof to DCS of his regular employment nor to keep DCS advised of where he was working. Throughout the duration of this case, [A.N.W., Sr.] provided a single pay stub to DCS. [A.N.W., Sr.] also testified that he immersed himself in work, sometimes holding three jobs at one time, on order "to get back on his feet". [A.N.W., Sr.] testified that Mother took all his money to buy drugs when she left in February 2002. In spite of his claims of being employed

almost constantly for the last eighteen months, [A.N.W., Sr.] estimates he has approximately $200 saved for an apartment. [A.N.W., Sr.] also estimated that he had paid $500-$600 in child support during that time. The court's records indicate that [A.N.W., Sr.] has only paid $224.73 in child support, well below his court ordered requirement of $50 per week [sic].[3]

19) [A.N.W., Sr.]'s mental health is an issue. [A.N.W., Sr.] was required to obtain a psychological assessment and parenting assessment in early April 2002. DCS had scheduled this assessment for him for May 2002. [A.N.W., Sr.] missed the appointment either because he forgot or because he was busy working, he doesn't specifically recall why. [A.N.W., Sr.] finally completed these assessments in October 2002. The assessment recommended that [A.N.W., Sr.] follow up with a psychiatric assessment. [A.N.W., Sr.] did not follow through with this either. DCS set up a psychiatric assessment for [A.N.W., Sr.] in June 2003. [A.N.W., Sr.] missed that appointment.

20) Even though [A.N.W., Sr.] has completed the psychological assessment, he faces years of regular treatment and therapy. At most, Dr. Thomas Monroe, III Pys.D. can only recommend supervised visitation at this time. Dr. Monroe diagnosed [A.N.W., Sr.] with Personality Disorder. This is a chronic condition and is most often characterized by a person who is self-centered and who has little disregard for others views, opinions or efforts. In most instances two to five years of therapy is necessary. As explained by Dr. Monroe, treatment is difficult because the patient will not see the need for treatment because of their self-absorption and because they have little regard for others opinions. Moreover, alcohol and drug use makes successful treatment of this condition difficult. Dr. Monroe says much more is needed that [sic] merely alcohol and drug treatment in order to successfully treat [A.N.W., Sr.]'s mental health condition.

21) As a parent, Dr. Monroe states that [A.N.W., Sr.] would have difficulty fostering a warm, nurturing and loving blond with a child. [A.N.W., Sr.] would also have difficulty responding to a child's needs. To date [A.N.W., Sr.] has not had a psychiatric evaluation nor has he begun any therapy.

---

[3]Contrary to this particular finding, the record reveals no such award. Nonetheless, the support paid by the A.N.W., Sr., is well below the $50 per month actually awarded.

22)     Dr. Monroe observed that [A.N.W., Sr.] has a consistent inability to acknowledge his responsibility for his children being in DCS custody. [A.N.W., Sr.] also testified essentially the same in court. [A.N.W., Sr.] admits that his mother's home was not suitable for children. [A.N.W., Sr.] admits he knew that he needed to find suitable housing. [A.N.W., Sr.] admits that he knew he needed to refrain from drug use. [A.N.W., Sr.] admits he knew that he needed to step up and be responsible. Nonetheless, when pressed, [A.N.W., Sr.] denies responsibility for the children being in foster care. [A.N.W., Sr.] can only admit that he relied too much on Mother to do the right thing for the children.

23)     With regard to termination grounds as to [A.N.W., Sr.] several conclusions are clear. First, [A.N.W., Sr.] only made an effort to legitimate these children after they were removed from Mother's home and placed into DCS custody. Second, [A.N.W., Sr.] admits that the home where he lived (his mother's) at the time the children were removed was not suitable for the children. [A.N.W., Sr.] eventually moved to another home but has never established a residence where he has enforceable rights as a tenant or owner. In fact, [A.N.W., Sr.] has moved in with a girlfriend who has minor children. [A.N.W., Sr.] and this girlfriend have experienced relationship difficulties, which have caused [A.N.W., Sr.] to leave and return to his mother's home for months at a time. At present, [A.N.W., Sr.] and his current girlfriend do not have their own residence but are living with a friend in that friend's apartment.

24)     [A.N.W., Sr.] very likely suffers from a bona fide mental illness for which he has not sought treatment. Since late last year, [A.N.W., Sr.] has been aware of a psychological recommendation that he have a psychiatric evaluation and should begin psychotherapy. This recommendation is due to diagnosis that [A.N.W., Sr.] has a Bipolar Affective Disorder and an Antisocial Personality Disorder with Borderline Features. Because of these diagnoses, a licensed clinical psychologist says unequivocally that [A.N.W., Sr.] cannot be considered as a custodian of these children at this time. In fact, this same expert says that any visitations at this time should be supervised. This expert also says that typically, treatment for [A.N.W., Sr.]'s conditions will take years. This expert states that [A.N.W., Sr.] is a dangerous man. Again, [A.N.W., Sr.] has offered no expert proof to the contrary about these psychological findings.

25) [A.N.W., Sr.]'s mental health and treatment is made all the more problematic by [A.N.W., Sr.]'s knowing and deliberate use of drugs. [A.N.W., Sr.] readily admits that he knew when the children were placed into DCS custody that his drug use was a concern. [A.N.W., Sr.] admits he knew that he needed to seek drug treatment and, more importantly, abstain from drug use. In spite of this knowledge, [A.N.W., Sr.]'s drug use increased. Only until the petition to terminate his parental rights filing, did [A.N.W., Sr.] take steps to address his drug usage. [A.N.W., Sr.] only completed a drug rehabilitation program within 45 days of this hearing and was admittedly using drugs as recently as 120 days prior to this hearing. According to Dr. Monroe, [A.N.W., Sr.]'s drug use makes any successful psychotherapy even less likely.

26) [A.N.W., Sr.] contends that his employment prevented him from complying with the tasks set out in the permanency plans. Granted, [A.N.W., Sr.] has been steadily employed throughout this episode. Obviously he is not lazy. [A.N.W., Sr.] justifies this almost singular focus on employment due to the need to support his children and to be able to establish his own residence. Nonetheless, [A.N.W., Sr.] has contributed only nominal financial support and has saved around $200, barely enough for the most minimal deposit for rent.

27) [A.N.W., Sr.] has noble intentions and desires. Everyone is convinced he cares for his children and wants what is best for them. [A.N.W., Sr.] is unable or unwilling to make the commitment needed over the long haul for these children. [A.N.W., Sr.] is very able and willing to make the superficial commitment of making regular supervised visits. [A.N.W., Sr.] has failed to take the more substantive steps of proving that he is capable or willing to make the commitment to be a parent seven days a week, twenty-four hours a day.

28) As to the best interests of the minor children, the court finds that neither parent has made an adjustment of circumstances, conduct or conditions as to make it safe and in the children's best interest to be in the home; neither parent has made a lasting adjustment after reasonable efforts by DCS; Mother has not maintained regular visitation or contact with the minor children; until termination was filed, there was the continued use of illegal substances by [A.N.W., Sr.] and [A.N.W., Sr.] has not presented any negative drug screens proving his abstinence since the last test administered by DCS; [A.N.W., Sr.]'s mental health status would be detrimental to the

children and prevent him from effectively providing safe and stable care and supervision for the children; neither parent has paid child support consistent with the child support guidelines.

**THE COURT MAKES THE FOLLOWING CONCLUSIONS OF LAW:**

1) These children were found to be dependent and neglected by this Court and was placed in the custody of the Department of Children's Services; the Department made reasonable efforts to prevent removal or the children's situation prevented reasonable efforts from being made prior to removal; the Department has made reasonable efforts to assist the parents to establish a suitable home for the children for a period of four (4) months following the removal, but neither parent has made reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the children to such a degree that it appears unlikely that they will be able to provide a suitable home for the children at an early date.

2) Mother has abandoned these children in that she has willfully failed to engage in more than token visitation for four (4) consecutive months immediately preceding the filing of the termination petition.

3) Mother and [A.N.W., Sr.] have abandoned these children in that they have willfully failed to support or make reasonable payments toward the support of the children for four (4) consecutive months immediately preceding the filing of this petition.

4) The children have been removed by order of this Court for a period of six (6) months; the conditions which led to their removal still persist and other conditions, specifically the mental health issues of [A.N.W., Sr.], persist which in all probability would cause the children to be subjected to further abuse and neglect and which, therefore, prevent the children's return to the care of either Mother or [A.N.W., Sr.]. There is little likelihood that these conditions will be remedied at any early date so that these children can be returned to either parent in the near future. The continuation of the legal parent and child relationship greatly diminishes the children's chances of early integration into a stable and permanent home.

5) Despite frequent explanations of the statement of responsibilities set out in periodic foster care plans prepared for and signed by parents, they have failed to comply in a substantial manner with those

-14-

reasonable responsibilities related to remedying the conditions which necessitate foster care placement.

6)      Awarding legal and physical custody of the children to either mother or [A.N.W., Sr.] would pose a risk of substantial harm to the physical or psychological welfare of the children.

Now having found that grounds for termination of parental rights exist, Tennessee Code Annotated § 36-1-113 (I) requires a best interest analysis of nine or more factors.

1)      The evidence is clear that neither Mother nor [A.N.W., Sr.] has made a significant adjustment of circumstances or conditions to make placement in either's home safe or in the children's best interest. Although DCS has made reasonable efforts to refer and provide both parents with resources, neither [A.N.W., Sr.] nor Mother has accessed these services for any duration to demonstrate a lasting positive change in their lifestyles.

2)      While the Mother has essentially abandoned these children by not visiting for five months preceding the termination hearing, [A.N.W., Sr.] has maintained regular and consistent contact with these children. In spite of [A.N.W., Sr.]'s regular contact through visits, all such visits have been limited in duration and have been supervised due primarily to [A.N.W., Sr.]'s continued drug use. Because these visits have been so limited, [A.N.W., Sr.]'s relationship with the children is likewise limited.

3)      The evidence indicates that the children see their foster parents as their primary caregivers and view them as their Mother and [A.N.W., Sr.]. Expert testimony from Dr. Monroe also reveals that [A.N.W., Sr.] has unrealistic expectations for his children in that [A.N.W., Sr.] does not appreciate the gradual social and emotional development of children. Dr. Monroe also opines that [A.N.W., Sr.]'s unrealistic demands and lack of insight will cause him frustration. This frustration will likely force [A.N.W., Sr.] into a less nurturing and more demanding confrontational parenting style. Furthermore, in light of Dr. Monroe's prognosis for [A.N.W., Sr.]'s mental health treatment, many months if not years will pass before [A.N.W., Sr.] has successfully completed his treatment.

4)      [A.N.W., Sr.] has not abused these children. In a sense he has not actively neglected these children. [A.N.W., Sr.]'s neglect is more of

-15-

a passive type due to his consistent tendency to rely upon others to perform tasks that are his responsibility. [A.N.W., Sr.] testified that he relied upon the Mother to act and take the necessary steps to prevent these children from languishing in DCS custody. [A.N.W., Sr.] was dependent upon the paternal grandmother for housing initially and deferred to her with regards to cleaning that home and rendering it suitable for the children's placement. When that option failed, [A.N.W., Sr.] made an inquiry for his own housing and DCS provided him the necessary information. [A.N.W., Sr.] failed to follow through with those referrals. Finally, [A.N.W., Sr.] began a relationship with another woman and relied upon her for housing. Most recently, [A.N.W., Sr.] and his girlfriend are living with yet another person. [A.N.W., Sr.] has had ample opportunity and notice to seize the initiative and establish his own housing. At best his current housing is tenuous.

5) Finally, neither [A.N.W., Sr.] nor Mother have made any significant contributions towards the children's financial support though [A.N.W., Sr.]'s efforts have been greater than Mother's. Nonetheless, this lack of support does not provide any indication that [A.N.W., Sr.] can provide for the daily needs of these children. More telling, this lack of support once again demonstrates [A.N.W., Sr.] is content to rely upon others to provide for those needs and indicates his lack of concern.

6) While the evidence indicates that these children have experienced a number of placement disruptions while in DCS custody, the evidence also indicates that they are readily adaptable due to their young ages and lack of serious emotional or physical issues. To deny termination and continue to seek reunification is desirable, it is unrealistic due to the unknown duration and success of [A.N.W., Sr.]'s mental health treatment and the long-term success of his drug rehabilitation. This court is confident that permanency through adoption will be attained long before a successful reunification with [A.N.W., Sr.] will occur.

**THEREFORE THE COURT FINDS** It is in the best interest of the children and the public that all of the parental rights of the mother, [N.M.] and [A.N.W., Sr.], [A.N.W.,Sr.], to these children be forever terminated, and that the complete custody, control and full guardianship of [A.Y.M.] and [A.N.W., Jr.], be awarded to the State of Tennessee, Department of Children's Services, with the right to place them for adoption and to consent to such adoption in loco parentis.

From the Order terminating his parental rights, A.N.W., Sr., appeals, arguing that clear and convincing evidence does not support the reasonable efforts finding, A.N.W., Sr.'s, failure to substantially comply with the permanency plan goals, and A.N.W., Sr.'s, abandonment of his children. In addition, Appellant challenges the best interest finding.

## I. Reasonable Efforts and Persistent Conditions

The consideration of Appellant's first issue occurs against the backdrop of a specific finding by the trial court that as early as January 2003 that the Department had exercised reasonable efforts at reuniting the children with their parents. This finding was upon consideration of the uncontroverted Affidavit of Reasonable Effort submitted by the State. The evidentiary record is replete with accounts of the deplorable conditions of 55 Upton Heights, A.N.W., Sr.'s, continued unavailability to meet with Homemaker Services, and the parental grandmother's inability and unwillingness to make her home safe for children. A.N.W., Sr., would argue that the paternal grandmother's lack of cooperation should not work against him in this reasonable efforts consideration. To the contrary, the Order of the court, as supported by the proof, more than adequately complies with the requirements of Tennessee Code Annotated section 37-1-166.

Concerning the stability of the home and the reasonable efforts in that regard, the appellant argues that the Department failed to conduct home studies at his most recent residence, which he occupied with the girlfriend, [M.C.]. This argument ignores the fact that throughout the history of A.N.W., Sr.'s, relationship with the juvenile court and with the Department, he had yet to establish a residence suitable for inspection. A.N.W., Sr.'s, girlfriend cancelled one prospective home visit scheduled for October 2002 due to the girlfriend's child being ill with chickenpox. It bears noting that A.N.W., Sr., made no effort after this cancellation to reschedule a visit until after April 2003, some three months after the January 2003 finding that the Department had pursued reasonable efforts to reunify the children with their parents, a date coinciding roughly with the staffing of the only permanency plan which A.N.W., Sr., personally attended, the goal of which was to pursue adoption of the children. At trial, A.N.W., Sr., testified to his lack of a permanent residency suitable for the children.

A.N.W., Sr., summarizes his criticism of the Department's efforts by essentially second guessing those efforts:

> The only services offered to [A.N.W., Sr.] addressing his illegal drug use was information provided to him little over one month prior to the Petition to Terminate Parental rights being filed. Additionally, as discussed *supra*, no services were provided by DCS during an entire four-month period, from approximately April 28, 2002, until August 27, 2002.

To the contrary, the record and transcript reveal that every effort the Department took to address the conditions which led to removal and persistent conditions which endanger the children,

was met, at best, with A.N.W., Sr.'s, indifference until the date of the final parenting plan staffing. A.N.W., Sr.'s, testimony reveals the major reasons for his delay: his addiction to drugs and his inability to take responsibility for his own actions with regard to making a safe, stable and suitable home for his children, maintaining steady employment, and addressing the serious psychological issues raised as a result of his parenting assessment and psychological evaluation.

In his testimony, A.N.W., Sr., recounts that his addiction, and his inability or unwillingness to recognize the children as his, for the first year they were in State custody, has somehow changed despite his continued failure as of the time of the hearing to seek treatment for his anti-social disorder as diagnosed by Dr. Monroe, and his non-participatory attitude with regard to voluntary drug screens from April 2003 up until the date of the hearing.

A.N.W., Sr., enjoyed the benefit of counsel throughout the proceedings below, and yet failed to take any affirmative steps other than visiting his children for less than two hours a week. Not only does the record clearly establish that the Department exercised reasonable efforts, but it equally conveys A.N.W., Sr.'s, failure to substantially comply with the goals set forth in the Permanency Plans.

## II. Abandonment

As for the claims of abandonment, Tennessee Code Annotated section 36-1-102(1)(A)(i) defines abandonment as either the willful failure to visit or the willful failure to support "or make reasonable payments toward the support of the child." The transcript reveals that from December 2002 to April 2003, despite the existence of a court order requiring $50 per month of support to be paid for both of these children, and despite A.N.W., Sr.'s, having no living expenses to speak of and a job with McDonald's, which left him in excess of $200 at the end of the month, he refused to cause any of that overage to be paid for the support of his children. Nonetheless, A.N.W., Sr., would argue that his bringing of gifts at visitation periods would constitute support in excess of that ordered by the Statute. The trial court was unpersuaded. We are likewise unpersuaded by this argument. This failure, under the circumstances, satisfies the element of intent required by our case law. *See In re Swanson*, 2 S.W.3d 180, 189, n.14 (Tenn. 1999). Although the Department's documents and testimony at trial reveal a history, albeit a lackluster one, of support payments, the majority of these payments occurred as a result of garnishment and occurred outside the relative four-month period of our consideration, the four consecutive months immediately preceding the filing of the termination petition. *See* Tenn.Code Ann. § 36-1-102; *See also In re D.L.B.*, 118 S.W.3d 360, at 366 (Tenn. 2003).

## II. Conclusion

A parent's fundamental right to the care, custody and control of his children is well settled in our jurisprudence. *See Stanley v. Illinois*, 405 U.S.645, 651 (1972). That this fundamental right is not absolute is equally well settled. *See Santosky v. Kramer*, 455 U.S.745, 768 (1982); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn.Ct.App. 1988). This fundamental right is always balanced against the cardinal factor in all child custody and termination of parental rights cases, the best

interest of the child. *See e.g., Tennessee Dept. of Human Svcs. v. Riley*, 689 S.W.2d 164, 169 (Tenn.Ct.App. 1984). It is this very conflict between the fundamental right of parentage and the best interests of children which requires the State to prove the statutory grounds for termination of parental rights by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). This Court has defined the clear and convincing evidence standard as more exacting than the preponderance of evidence standard, demonstrating the truth of the facts asserted as "highly probable" rather than "more probable than not". *See, e.g., In re C.W.W.*, 37 S.W.3d 467, 473-74 (Tenn.Ct.App. 2000), *perm app denied* (Tenn. Nov. 20, 2000). It is equally well settled that any inquiry into propriety of termination of parental rights does not stop with the finding of grounds. The terminating authority must find that termination is in the best interest of the child.

This case is unusual in the fact that A.N.W., Sr., has faithfully attended his limited visitations and apparently has a genuine interest in his children. It cannot be said that he has abandoned his children by failing to visit them. The record discloses, however, that this visitation is the only thing that casts him in a favorable light before the Court. He has abandoned his children by failure to support them. He has done little to remedy the conditions which led to the removal of his children in the first place. He has not complied with the requirements of the Permanency Plans. Termination of his parental rights is clearly in the best interest of the children.

The judgment of the trial court is in all respects affirmed, and the cause is remanded for such other proceedings as may be necessary.

Costs of appeal are assessed against the appellant.

_____
WILLIAM B.CAIN, JUDGE