IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 11, 2005 Session

## IN RE J.J.C., D.M.C, AND S.J.K., a/k/a K

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES
v.
## JOHN CALABRETTA

An Appeal from the Juvenile Court for Shelby County
No. M2432    Herbert J. Lane, Special Judge

No. W2005-01386-COA-R3-PT - Filed April 19, 2006

This is a termination of parental rights case. This is the second appeal in this matter. In the first appeal, the trial court had terminated the father's parental rights based on abandonment for failure to support his two children. On appeal, this Court reversed the termination on that ground, but remanded the case for further proceedings on the ground of persistent conditions. On remand, the trial court conducted further proceedings and determined that clear and convincing evidence established persistent conditions that prevented the children's safe return to the father. The father now appeals. We affirm, finding that the ground of persistent conditions was established by clear and convincing evidence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the Respondent/Appellant, John Calabretta.

Paul G. Summers, Attorney General and Reporter, and Douglas Earl Dimond, Senior Counsel, Nashville, Tennessee, for the Petitioner/Appellee, Tennessee Department of Children's Services.

**OPINION**

The background facts in this case are set out in the first reported decision of this Court. *See State v. Calabretta (In re J.J.C.)*, 148 S.W.3d 919 (Tenn. Ct. App. 2004). In this opinion, we set out only the facts relevant to the issues in this appeal.

Since 1985, Respondent/Appellant John Calabretta ("Father") and Linda Ann Bowers ("Mother") had lived together as an unmarried couple. Mother and Father are the natural parents of the two children who are the subject of this petition, D.M.C., a daughter born December 9, 1997, and J.J.C., a son born November 23, 1995. Another child was also involved in the original termination petition, S.J.B., a daughter born on July 8, 1999, whose natural parents are Mother and J. Maxwell Karam ("Karam").

In March 1998, Father was incarcerated for being an habitual motor vehicle offender. On April 17, 1988, while Father was incarcerated, Mother was arrested for possession of drug paraphernalia. As a result, D.M.C. and J.J.C. were taken into protective custody by the Department of Children's Services ("DCS"). When Mother was arrested, there were no utilities in her home and very little food. J.J.C. was suffering from an eye infection, and DCS later discovered that D.M.C. had tested positive for cocaine at birth.

As a result of these conditions, on May 20, 1998, D.M.C. and J.J.C. were found to be dependent and neglected. They remained in foster care under DCS custody. In June 1999, Father was released from prison. When S.J.B. was born in July 1999, she also tested positive for cocaine. Consequently, on July 16, 1999, S.J.B. was taken into protective custody by DCS as well, and placed with the same foster family as D.M.C. and J.J.C. On August 25, 1999, S.J.B. was likewise determined to be dependent and neglected.

DCS developed permanency plans for the children, that is, plans of care setting forth what Mother and Father would need to do to regain custody. These plans were presented on June 22, 1998, while Father was still incarcerated. Under the June 1998 plans, in order to regain custody, Mother was required to maintain contact with DCS, get therapy for her drug problem by attending an in-patient detoxification program and weekly meetings for cocaine abusers, and get stable housing. Father's sole responsibility under the June 1998 permanency plans was to contact DCS and the juvenile court to make plans for the children's future. The plans also provided that Father and Mother were to pay child support if ordered by the court. Mother signed those plans, acknowledging receipt of them, but Father did not.

As noted above, Father was released from prison in June 1999. On September 20, 1999, after S.J.B. was born and taken into protective custody, an updated set of permanency plans for all of the children was developed. The updated permanency plans included many of the same requirements for Mother, with the additional requirement that she attend parenting classes. Though both Mother and Father signed the updated permanency plans, the plans contained no responsibilities for Father.

On August 2, 2000, a third set of permanency plans was developed. These plans included the same requirements for Mother, but in addition required Father to attend parenting classes and "submit to periodic; [sic] random alcohol test[s] to prove sobriety." Neither Mother nor Father signed the August 2000 set of plans.

On March 11, 2001, Father was imprisoned for another motor vehicle violation. The next day, on March 12, 2001, DCS filed the petition below to terminate the parental rights of Father, Mother, and Karam as to the three children, D.M.C., J.J.C., and S.J.B. With respect to Mother, the petition asserted as grounds for termination the existence of persistent conditions preventing the children from safely returning to Mother's custody. *See* T.C.A. § 36-1-113(g)(3)(A) (Supp. 2004). As grounds for the termination of Father's parental rights, the petition asserted that Father had abandoned D.M.C. and J.J.C., based on Father's failure to pay support or seek reasonable visitation. *See* T.C.A. § 36-1-113(g)(1) (Supp. 2004). The petition alleged that all three respondents had failed to comply with the DCS permanency plans. DCS later amended its petition to allege that all of the respondents had willfully abandoned the children by failing to pay support or to visit, and alleging persistent conditions preventing the safe return of the children to their custody. Karam did not respond to the petition, and on May 23, 2001, the trial court entered a default judgment against him, ordering the termination of his parental rights as to S.J.B. Karam did not appeal that order, and his parental rights are not at issue in this case.

On February 11, 2002, the trial court conducted a trial on DCS's petition to terminate the rights of both Father and Mother. The record of this trial consists of two statements of the evidence submitted by the parties and a partial transcript of the evidence. The statements of the evidence and the partial transcript indicate that the proof showed that the DCS case worker discussed with Father and Mother the need to demonstrate sobriety, complete parenting classes, and obtain stable housing before they could regain custody of the children. The parties were not told that they needed to pay child support. The record indicated that Father and Mother obtained stable housing by moving into a house on Westover in Memphis that Mother inherited. On the other requirements, however, the DCS case worker testified that Mother never provided DCS with evidence that she had successfully completed an alcohol or drug treatment program, parenting classes, or obtained employment. In 2000, Father attended eight of ten scheduled supervised visits; between January and October 2001, he attended two of five scheduled supervised visits. Father and Mother occasionally brought gifts to the visits, but never paid child support. After the termination petition was filed, Father and Mother attended parenting classes. The DCS case worker testified that all three children remained together in the foster home in which they were originally placed. The foster parents had expressed an interest in adopting them.

The statements of the evidence and the partial transcript indicated that Father testified at the first trial. He admitted that he had used drugs in the past, asserting that he had not used marijuana "in quite a while," but acknowledging that he had used cocaine on one occasion a month prior to the trial. Father maintained that he did not have a drug problem, but admitted to having used drugs while the children were in the house. Father explained that he and Mother do not do drugs in the presence of the children, but wait to do so when the children were asleep. He admitted that he did not "consider it appropriate, but it was better to do it there than try to go out on the streets and do it and have somebody baby sit and go somewhere else to do it." *Calabretta*, 148 S.W.3d at 923 (quoting Father's trial testimony).

At the conclusion of the first trial, the trial court terminated the parental rights of both Father and Mother. Mother, whose rights were terminated as to all three children, did not file an appeal, and her rights are no longer at issue. Father's rights were terminated as to D.M.C. and J.J.C. based on the ground of abandonment for his willful failure to support the children. On appeal, this Court reversed the termination of Father's parental rights on the ground of abandonment, but noted that DCS had also alleged in its amended petition that Father's rights should be terminated on the ground of persistent conditions. In light of the amended petition, this Court remanded the case to the trial court to determine whether clear and convincing evidence established persistent conditions that would prevent the safe return of the children to Father's custody. The trial court was permitted, "in its discretion, [to] consider further evidence on remand." *Id.* at 928.

On remand, the trial court conducted further proceedings on the termination petition with respect to the ground of persistent conditions. A hearing was scheduled for January 13, 2005, but was continued.[1] The hearing was recommenced on May 12, 2005. The trial court heard testimony from two case managers who had worked on the case, Novel King ("King") and Kenneth Perry ("Perry"), and the foster mother of the children, Katherine Hassell ("Hassell"). Each was examined by counsel for the parties and by the children's guardian ad litem.

King testified that the case was opened in March 1998, and she was assigned as the case manager in March 2000; she remained the caseworker on the matter until May 2001. King was permitted to testify about the history of the case prior to her involvement, based on her review of the case file. From her review of the file, King testified that the children were placed in DCS custody on April 17, 1998, when J.J.C. was two years old and D.M.C. was four months old. King recounted that the children had been at home with Mother during a drug raid, at which time Mother was taken into custody and the children were taken into protective custody.

The file included the permanency plans, described above, developed in 1998, 1999, and 2000. King said she had attended the 2000 permanency plan meeting. The plan developed at that time required Father to take parenting classes and submit to random alcohol and drug screenings. Neither Mother nor Father attended the meeting, and therefore did not sign the 2000 Plan. However, King met with Mother and Father afterwards to discuss the permanency plans. She told them that, in order to get the children back, they needed to maintain a stable home, resolve their drug issues, and attend parenting classes.

King testified that Father admitted to her that he did not have stable housing, other than the home he lived in with Mother on Westover in Memphis, Tennessee. King said that, at some point after the children were taken into DCS custody, Father moved to Nashville in an attempt to build a home for himself and the children, so that they would have stable housing apart from Mother. His move was unsuccessful. He could not drive because his driver's license was revoked for being an

---

[1] At the January 13, 2005 hearing, counsel for DCS was not prepared to offer evidence as to matters that were proven at the first trial. When it became apparent that more extensive information about the case's history needed to be presented, a continuance became necessary.

habitual motor vehicle offender, so he could not see the children. Therefore, at some point, he moved back into Mother's home in Memphis. King said that, over the history of the case, Father had never had a stable home other than when he lived with Mother.

King recalled that, at one court appearance that took place while she was the case manager, Father was asked to submit to a drug screen. He responded that he could not do so because he had just smoked marijuana. Father admitted to King that he used drugs and admitted in testimony in the previous trial that he had used cocaine. King said that Father knew that Mother used drugs, but simply maintained that they did not use them in front of the children. King said that, at one point, she told Father that in order to regain custody of the children, he needed to move away from Mother. This information, however, was never written in a permanency plan. King testified that she told Father to stop using drugs and to take random drug screenings; however, these statements to him had not been documented in the record.

King testified that Father attended parenting classes only after the termination petition had been filed. When asked whether Father had ever failed a random drug test, King responded that there had been no failures, but there had been one test result in which his sample was diluted, which caused her to believe that it would have been positive. She said that the records reflected that he had been asked to take a drug test three times, but actually tested only once.

King was asked about the stability of Father's home in the history of the case. She said that, during the period of time in which she was the case manager, the home of Mother and Father was "fine," and "[t]here was nothing wrong with their house. . . . Ms. Bowers had stable housing, and Mr. Calabretta stated that he lived with Ms. Bowers. So the housing was fine." However, as noted above, Father's only stable housing was when he lived with Mother. He was never regularly employed, but earned income from odd jobs, "scrapping metal and building stuff."

King testified that the children were very well bonded with the foster parents. King said that Father visited with the children on occasion, missing some visits because he was incarcerated or in Nashville. She described Father as being very interactive with the children during visits, but said that his relationship with the children was not a paternal one. Father would bring a video camera and snacks for the children, and on some occasions he would bring toys. There was no evidence that Father ever injured the children. King said, however, that issues with at least one of the children arose after visits with Father, such as nightmares and wetting the bed. Those issues were dealt with by the foster mother in the home, not through formal counseling. In light of these aftereffects from the visits, King felt that the visits with Father did not serve the children's best interest.

The next caseworker, Perry, testified as well. He was assigned to the case as DCS "case manager 2" in August 2003, and remained the caseworker on the matter until the time of trial.[2] Perry's duty was to manage the court proceedings and get the family ready for adoption. Included

_____

[2]Sometime after King but before Perry, Anthony Guy was the case manager. The record does not reflect the names of other case managers in between.

in those duties, he visited the children, dealt with the foster parents, made sure that the children were visiting the doctor and going to school, and kept the records in the case.

On October 8, 2004, Perry conducted a home study at the address given to him by Mother and Father, 2580 McAdoo Street. When he arrived at the home, Mother answered the door. She told Perry that she had been married to Father for twenty-three (23) years, and that they both lived in the house.[3] She also told him that she was aware that her parental rights had been terminated, but that Father was going to get the children back on the October 2003 court date. Perry described Mother as having a bad odor and looking unwell, noting that she had lesions on her neck and arms. He said that he could not stay in the home long because he could not bear the smell. Perry observed that there was basically nothing in the house; Mother explained to him that the house was being remodeled. Perry observed that the house was "full of paint," but saw no kitchenware or anything else that would indicate that it was ready to be lived in. No children were living in the house at the time.

On cross-examination, Perry admitted that he found no drugs or drug paraphernalia during his visit to the house, nor any evidence of illegal activity. When asked what services DCS provided to bring the home up to a living standard, Perry responded that no services were offered because the house on McAdoo Street was not owned by Mother and Father. Perry said that he spoke to the owner of the house, who told him that Father was only living in the home because he was remodeling it for her. Perry said that Mother and Father were essentially homeless.

Perry testified that, after he took the case, he had only one conversation with Father, which took place on May 6, 2005. In this conversation, Perry asked Father about his drug use. Father told Perry he had not used drugs in 2005, but conceded that he had used drugs "off and on" in 2004. When Perry asked Father where he would take the children to live if they were given back to him, Father said that they would live at the house on Westover, which Mother had purportedly inherited. Father told Perry that he was not living at the address on Westover at the time, but said that he could get the house if he needed to, because Mother would sign it over to him. Subsequently, Perry visited the house on Westover. When he knocked on the door, there was no answer, and a neighbor told Perry that no one lived there.

In his conversation with Father, Perry asked Father to submit to a drug test. Father agreed to do so. Perry offered to drive him to the test, but Father said that he could get there on his own. A few days later, Perry went back to ensure that Father had transportation to the testing site, and Father told Perry that he had a ride. However, Father never appeared for the drug test.

From a background check, Perry noted that Father had been incarcerated numerous times. At the time of trial, Perry testified, Father had been doing side work for an individual who paid him in cash.

---

[3]She told Perry that her name was Linda Calabretta, but it is undisputed that the person with whom Perry met was Linda Bowers, the mother whose rights had been terminated in the earlier proceeding.

The trial court also heard testimony from the children's foster mother, Katherine Hassell, a third-grade teacher. She also had custody of S.M.J., the children's half-sister whom she had already adopted, and a daughter of her own. Hassell testified that, since she took custody of the children in March 1999, she had attended visits between Father and the children. However, she could not remember the date of Father's last visit. She said that the children would probably recognize Father, but they did not ask to see him. It was her understanding that Father had not asked to visit the children since the trial court terminated his parental rights in 2002.

Hassell said that D.M.C. was doing very well in the first grade at school and that she had made friends there. She discussed the activities they do together, such as reading, playing house, coloring, and baking. Hassell said that J.C.C. has attention deficit disorder and dyslexia, which, at the time of trial, was being treated by taking Concerta each day. Although he received some special education services at school, he was mainstreamed into the regular classroom. Hassell works with J.C.C. on his homework. Both children had trouble with the muscles in their eyes, but Hassell had taken measures to address those problems.[4] Otherwise, the children were in good health, and at the time of trial, they were not seeing a counselor for any emotional difficulties. Hassell said she lived with the children in a four-bedroom home. Counsel for Father stipulated that Hassell had a better household situation than did Father. Hassell testified that she was definitely willing to adopt these children.

At the conclusion of trial, the trial court determined that clear and convincing evidence showed that the conditions that led to the removal of the children still persisted, thereby preventing their safe return to Father's custody. The trial court reasoned:

> It appears that the Department became involved in this case in 1998. And over a period of at least two years, they worked with the mother and father in an attempt to try and get some of these problems resolved. When they couldn't get the permanency plan followed, it appears that they changed the goal to one of adoption.
>
> The father was aware that, in fact, that was going to take place if he did not resolve these problems. And it would seem to me that at the time the case came before the Court initially, these conditions that existed were detrimental to the health and safety of the children, and that was the drug usage of the mother and the father. The father admitted when he came to court he couldn't pass the drug screen.
>
> Here we are some five years down the road and the last contact he had a year ago with Mr. Perry was to the effect of, well, yeah, I'm still using, but I don't do it in front of the children. He doesn't have a place to live. I would think that facing a termination with all these things going on in his life, he would have thought that the time to get all this resolved was while the children were in foster care and all he had to concentrate on was just getting his own situation resolved.

---

[4] D.M.C. had a "wandering eye," which was controlled through sessions with an ophthalmologist. J.C.C. was born without a muscle in his right eyelid, and he has had two surgeries to correct this problem. J.C.C. also has an astigmatism, which has been corrected by wearing glasses.

Not only did these conditions exist at the time of the original termination, they still exist today. It doesn't seem that he's made any progress whatsoever.

These children have been in foster care now for six years. There has to be some permanency for the children. I think the State has shown, by clear and convincing evidence, that these persistent conditions did exist.

\* \* \*

The drug usage of the – both the mother and the father . . . led to the neglect of the children. Lack of adequate housing by the father as of today's date. I don't know if he's employed. I don't know if he has the ability to take care of the children, so all of those are conditions that are existing today that I think existed at the time the termination was granted.

The trial court further determined that termination of Father's parental rights was in the best interest of the children. Father essentially stipulated that the best interest factors weigh in favor of termination. From that order, Father now appeals.

On appeal, Father argues that this Court erred in allowing DCS to raise the issue of persistent conditions during the first appeal, and also erred in remanding for further proceedings on the issue of persistent conditions, because DCS had expressly waived that issue at the first trial. Furthermore, Father argues that, on remand, the trial court erred in determining that persistent conditions existed by clear and convincing evidence.

Our standard of review remains the same as in the first appeal in this case. Under Tennessee Code Annotated § 36-1-113(c), a parent's rights may be terminated based on the following:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
(2) That the termination of the parent's or guardian's rights is in the best interests of the child.

T.C.A. § 36-1-113(c) (Supp. 2004). Because the decision to terminate parental rights involves fundamental constitutional rights, both elements of section 36-1-113(c) must be proven by clear and convincing evidence. *See In re C.M.R.*, No. M2001-00638-COA-R3-JV, 2002 WL 192562, at \*3 (Tenn. Ct. App. Feb. 7, 2002). The clear and convincing standard in termination cases is more than a "preponderance of the evidence" but less stringent than a "beyond reasonable doubt" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995). Clear and convincing evidence "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *Id.* Considering this heightened standard, we review the trial court's findings of fact *de novo* on the record, with a presumption that the trial court's factual findings are correct. Tenn. R. Civ. P. 13(d); *see In re C.M.R.*, 2002 WL 192562, at \*3; *Graham v. Copeland (In re Adoption of Copeland)*, 43 S.W.3d 483, 485 (Tenn. Ct. App. 2000); *Tenn. Dep't of Human Servs. v. Riley*, 689 S.W.2d 164, 170 (Tenn. Ct. App. 1984). The trial court's conclusions of law are reviewed *de novo*, with no such presumption of correctness. *Copeland*, 43 S.W.3d at 485.

The enumerated grounds for termination are found in section 36-1-113(g) of the Tennessee Code Annotated. A decision to terminate parental rights may be based on any one of the grounds enumerated in the statute. *See In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000). Father's rights were terminated based on the finding of persistent conditions preventing the likelihood of the children's safe return to Father's home, referred to in shorthand as "persistent conditions." The applicable statute provides that parental rights may be terminated when:

> . . . The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A) (Supp. 2004). Thus, a parent's rights may be terminated if the same conditions that led to the child's removal still exist, or if "other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect" threaten the child's safe return to the care of the parent.

We first address Father's contention that this Court erred in allowing DCS to raise the "persistent conditions" ground for the first time in the first appeal, and also in remanding the issue for further proceedings. We must note that this issue was not raised by Father until this appeal, either by petition to rehear this Court's decision in the first appeal, or by further appeal to the Supreme Court. Father points to no place in the appellate record in which the issue of DCS's alleged waiver of the ground of persistent conditions was raised to this Court, the Tennessee Supreme Court, or even in the trial court below on remand. Under these circumstances, at this juncture, we must conclude that Father has waived his right to raise the issue. In the first appeal, this Court noted that "the amended petition of DCS alleged persistent conditions as a ground for the termination of Father's rights . . . ." There is nothing in this appellate record to indicate otherwise, or to indicate that DCS waived the issue in the first trial. It has now become the law of the case, and Father cannot now claim that this ground for termination was not properly raised before the trial court. *See Memphis Pub. Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) (discussing the law of the case doctrine). Furthermore, at the hearing on remand, Father was permitted to introduce evidence to challenge the allegations that persistent conditions existed, and in fact did so. Therefore, even if he had been unaware in the first trial that DCS sought to pursue termination based on persistent conditions, prior to the second hearing, he was fully aware and had the opportunity to put on countervailing proof of his situation at that time. Accordingly, we

find that the trial court did not err in addressing the ground of persistent conditions in accordance with this Court's opinion in the first appeal.

Father also argues that the ground of persistent conditions was not proven by clear and convincing evidence in the hearing on remand. Father claims that, in this Court's previous opinion, we expressed doubt about this ground for termination, noting that "the permanency plans do not address drug use by Father. Moreover, there is nothing in the record indicating that Father was informed that his continued cohabitation with Mother, a cocaine addict, would result in the termination of his parental rights." *Calabretta*, 148 S.W.3d at 928. Father contends that there was no evidence that he suffered from a drug habit, addiction, or problem. He also argues that King's testimony in the hearing on remand shows that DCS sought to keep Father and Mother together and had the goal of returning the children to the custody of both of them. He maintains that there was a dearth of evidence that Father continued to use drugs, noting that Father denied using drugs in 2005, and acknowledged only that he had used drugs "off and on" in 2004, and characterized his cocaine usage as being "in the past." He argues that DCS never proved that Father's recreational drug use ever adversely affected the children, and points out that no drugs or drug paraphernalia were found in the McAdoo house. Father claims he was never notified that he should separate from Mother in order to keep his parental rights. In fact, he claims, DCS did not argue that his continued relationship with Mother was grounds to terminate until after losing on appeal. In addition, Father argues, caseworker Perry made no effort to inspect the Westover house, even though Father had told Perry that he would live there with the children if they were returned to his custody.

In reviewing the trial court's decision, we find that the trial court rightly judged the circumstances as a whole and as they existed, rather than viewing them as Father said they could be at some undetermined time in the future. The children were removed in 1998 because Mother, an admitted cocaine addict, was using drugs and arrested while the children were in her custody, during a time when Father was in jail. The children were found to be dependent and neglected, and it was clear that the drug usage of both Mother and Father led to the neglect of the children.

Regardless of whether the evidence proves that Father is addicted to drugs, it shows clearly that drug use in the home by both Mother and Father is pervasive, and that Father has a cavalier, casual attitude toward drug usage and complete indifference to its profound effect on children in his care. Father contends that he was never told that continuing to live with Mother, an admitted cocaine addict whose parental rights have already been terminated, would prevent the return of the children to his custody. The trial court heard testimony to the contrary, and there is no reason for this Court to question the trial court's implicit finding of credibility on this issue. Moreover, the effect of Father continuing to live with Mother was clearly stated by this Court in the opinion on the first appeal, and yet Father continued to reside with her. The evidence clearly supported Perry's assertion that Mother and Father were essentially homeless, despite Father's rather implausible claim that he could get Mother to sign over to him the house on Westover, if custody were returned to him. The only evidence of income to Father was that he performed odd jobs at times for cash payments.

On the whole, the evidence supports the trial court's observation that Father has had "time to get all this resolved . . . all [Father] had to concentrate on was just getting his own situation resolved. . . . It doesn't seem that he's made any progress whatsoever." In sum, the children were removed because Father and Mother were unable to care properly for the children, and the evidence clearly and convincingly shows that Father continues to live with Mother, continues to have an unstable living situation, and is still unable to care properly for the children. Therefore, we find no error in the trial court's decision to terminate Father's parental rights based on persistent conditions that prevent the children's safe return to him.[5]

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Jon Calabretta, and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

_____

[5]Father does not argue that the trial court erred in finding that termination is in the children's best interest.